**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Mandi J. Friend, | ) | |
|       Plaintiff, | ) ) ) | Case No.: 13-5054-CV-SW-ODS |
| v. | ) ) | JURY TRIAL DEMANDED |
| Aegis Communications Group, LLC, Serve Registered Agent:    Registered Agent Solutions, Inc.    3225-A Emerald Lane    Jefferson City, MO 65109 | ) ) ) ) ) ) ) | |

## FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Mandi Friend, by and through her attorneys, and pursuant to Federal Rule of Civil Procedure 15, submits her First Amended Complaint for Damages against Defendant Aegis Communications Group, LLC ("Aegis"), and states and alleges as follows:

### STATEMENT OF THE CASE

Plaintiff seeks monetary damages, compensatory and punitive, in this case to redress her injuries and damage sustained as a result of Defendant's fraudulent and negligent misrepresentations, unjust enrichment, and breach of implied contract.

### PARTIES

1. Plaintiff, Ms. Mandi Jo Friend, is and was at all times mentioned herein a resident and citizen of the state of Missouri.

2. At all times mentioned herein, and for the four years preceding, Plaintiff was an employee of Defendant, Aegis.

3. Aegis is a Delaware Limited Liability Company with its principal place of business in Texas, is registered to do business in Missouri, and can be served through its registered agent. Its registered agent is Registered Agent Solutions, Inc., located at the address included in the caption.

4. At all times mentioned herein, before and after, all individually described perpetrators were agents, servants, and employees of Defendant and were at all such times acting within the scope and course of their agency and employment, and/or the actions were expressly authorized by Defendant and/or their actions were ratified by Defendant, thus making Defendant liable for said actions under the doctrine of respondeat superior.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy is greater than $75,000.00.

6. Additionally, there is a substantial federal question presented in this Complaint giving this Court jurisdiction pursuant to 28 U.S.C. § 1331.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this claim occurred in this judicial district.

8. Defendant is authorized to do business in and has purposely availed itself within Missouri and this judicial district, and the Plaintiff's claims arise out of these contacts, therefore Defendant is subject to personal jurisdiction within this Court.

# FACTS COMMON TO ALL COUNTS

## *While in the United States:*

9. Plaintiff worked at the call center owned and operated by Defendant in Joplin, Missouri. Her employment began during or around September, 2008.

10. During her employment, Plaintiff noticed a flyer posted in the workplace about a study abroad program offered by Aegis.

11. Deborah Zismer, head of Human Resources in Joplin, provided additional information to Plaintiff and other employees with what she purported to be a valuable educational opportunity.

12. That opportunity was the chance to apply for enrollment in a one-year study abroad program at Aegis Global Academy ("Academy").

13. The Academy is located in Cambiatore, India.

14. The program would cost Plaintiff nothing. She would receive a stipend and be provided living quarters in exchange for working minimal hours.

15. Upon completion of the study abroad program, Plaintiff would receive a Certificate in Program Management from Cornell University.

16. Pursuant to a written agreement Plaintiff entered into with Defendant, upon completion of the program and return to Joplin, she was to be placed in the "ACE Blue" program, which is Defendant's supervisor training program.

17. Plaintiff applied for the study abroad program, but was not initially offered an interview or otherwise selected.

18. Plaintiff attempted to contact Deborah Zismer in Human Resources to inquire as to why she was not selected, but she was unable to establish communication.

19. On May 22, 2011 a devastating tornado struck Joplin, Missouri.

20. Aegis employees from across the nation donated supplies for use by Aegis employees in Joplin, Missouri.

21. While Plaintiff was at the Joplin location gathering personal hygiene supplies, Drew Balentine from HR asked Plaintiff if she was still interested in the study abroad program.

22. Defendant's employees knew or should have known Plaintiff was financially struggling after the Joplin tornado.

23. Shortly thereafter, Plaintiff had a phone interview. At the conclusion of the interview, Plaintiff's interviewer told Plaintiff to tell Zismer to get Plaintiff's passport ready.

24. After learning that she was accepted to the program, Plaintiff inquired about additional information from Deborah Zismer, Drew Balentine, and David Curtis.

### *What Aegis Told Plaintiff about the Program:*

25. Plaintiff was told the program would be a great career advancement opportunity, because she would be trained in management.

26. Plaintiff was required to sign a leave of absence form with the Joplin office before her departure.

27. On or around August 12, 2011 Plaintiff flew out of Joplin, Missouri to Dallas, Texas, where she received additional information at the Aegis corporate site before traveling to India.

28. Plaintiff was provided with booklets that included information about the Academy program.

29. Plaintiff learned while in Texas that if she returned early or did not otherwise complete the entire program she would be financially responsible for the entire trip.

30. Plaintiff was told by Shrinvas Shetti that she would be regularly attending classes taught by live instructors.

31. Plaintiff was told she would be living on a college campus while in India.

32. Plaintiff was warned that electricity "might go out from time to time" during her stay in India.

33. Plaintiff was told she would be provided with three meals per day while in India.

34. In addition to completing online classes, Plaintiff understood she would be working part-time, performing the same duties that she had previously been performing while in Joplin, Missouri.

35. Plaintiff was told that she would be paid a stipend of 100 U.S. dollars per month.

36. Plaintiff was told that she would receive a SIM card (a pre-paid calling card) worth 500 rupees each month at the same time she received the stipend.

37. The stipend and SIM card were to be received on the first of every month during the Academy program.

38. Aegis employees, including Plaintiff's supervisors, completed all the necessary paperwork and acquired the necessary documents for Plaintiff to travel to India.

39. After briefly staying in Texas, Plaintiff flew to India.

40. Plaintiff was instructed to tell Indian Customs Agents that she was traveling to India for a six month business trip, even though Plaintiff was lead to believe, by Aegis employees, that she was traveling to India for a one year educational program.

### *The Events that Took Place in India:*

41. Upon her arrival to India, Plaintiff discovered she was sent there upon a work visa, not a student visa.

42. Plaintiff was placed in a public hostel, not a college dormitory. Her living quarters were not on a college campus.

43. Plaintiff began working at a call center the second day she was in India, and was required to work for the following eleven days.

44. Plaintiff performed the same job in India as she did when she was in Joplin, but her hours were different so that she could be on the phones during the business hours she worked when she was in Joplin.

45. While in India, Plaintiff responded to the same client base as she did when she was in India.

46. Plaintiff was offered online educational courses after two months of labor.

47. Plaintiff's first instruction on management training commenced six months after her arrival to Aegis University in India.

48. Plaintiff did not have any classroom instruction from any professor or instructor while in India.

49. Plaintiff observed Indian students, who were supposed to be attending Aegis University alongside the American exchange students, attend classes on a daily basis and were not required to work in the call center.

50. Plaintiff was forced to work more than forty hours per week.

51. The electricity in Plaintiff's living quarters went out frequently, for up to 24 hours at a time.

52. Meals were not provided by Aegis, but by the hostel management.

53. The meals were not adequate and were not consistent with the information Plaintiff received while she was still in the United States.

54. Even though at the beginning of the program Plaintiff received three meals per day, she soon began to receive only two meals per day.

55. Friend asked the hostel management why she was no longer receiving three meals per day. She was told that Aegis stopped paying the hostel enough for three meals per day.

56. Plaintiff was not allowed to attend church on Sundays because:

   a. she was forced to work instead;

   b. and Aegis would not pay for transportation to church services.

57. Despite being told she would receive 100 U.S. dollars per month, Plaintiff received 4500 rupees per month. This payment in rupees was not altered to reflect the change in the exchange rate from dollars to rupees.

58. The stipend and phone minutes were not provided on the first of the month as they were supposed to.

59. On one occasion, Plaintiff was told that she would not be receiving payment because it was an Indian holiday. Upon her own inquiry, she learned there was no national holiday on that day.

60. The food provided to Plaintiff by Defendant was often spoiled, rotten, and/or tainted and therefore unsafe for human consumption.

61. Plaintiff contracted E. Coli as a result of the food she was served and was hospitalized for three days.

62. Plaintiff made several complaints to the Standing Representatives at Aegis University and to Human Resources employees in Joplin, Missouri regarding the living and working conditions, the food she was served, and how the overall treatment she was receiving was materially different than what was presented to her while in America.

63. Plaintiff complained to Shaun Chettiar about the living and working conditions and the food she was served, and how the overall treatment she was receiving was materially different than what was presented to her while in America.

64. Plaintiff had two meetings with Essar executives, Aegis' parent company, where she complained of the living working conditions and the food she was served.

65. Plaintiff complained to Deborah Zismer, HR in Joplin.

66. Plaintiff explained to Zismer how the treatment she was receiving from Aegis in India was different than what she was told before agreeing to travel there. Specifically, Plaintiff told Zismer about the excessive hours, delayed pay, housing, and Aegis officers' responses to her requests was to return to America at her own expense.

67. Deborah Zismer was provided with information from Plaintiff that should have made Zismer aware of the conditions Plaintiff was exposed to in India and how the experience was not as what was explained to Plaintiff before traveling to India.

68. Zismer told Plaintiff she was unable to help Plaintiff, as the situation was out of her (Zismer's) control.

69. None of Plaintiff's complaints were responded to.

70. Plaintiff asked to go home at least five times while she was at Aegis University in India.

71. Plaintiff was informed that if she wanted to leave, she would have to quit the program and her job, and finance her own way back to the United States.

72. Plaintiff was informed that Aegis had no legal responsibility to ensure she returned to the United States safely if she did not continue to work and complete the program.

73. Plaintiff was reminded of the clause in the booklet that said if she did not complete the program she would owe money to Aegis for the entire trip.

74. Shaun Chettiar told Plaintiff if she went back to the United States early, she would have no job waiting for her.

75. Plaintiff was intimidated and feared she would suffer sufficiently serious harm if she did not continue to provide labor and services to Aegis, and therefore, Plaintiff continued to work against her will.

76. Plaintiff knew that a fellow Aegis employee had refused to continue working in these conditions and as a result this employee was not fed and Defendant refused to send him home. At the time this employee was refusing to work, he was left to fend for himself with little to no money.

77. Plaintiff's fear of serious harm was enhanced by her background and the circumstances surrounding her enrollment in the study abroad program and the events that occurred in Joplin shortly before that, including the tornado.

78. Plaintiff feared that if she did not continue to work, Defendant would withhold food, medical attention, and housing from her.

79. Plaintiff feared that if she did not continue to work, she would return to America without money or employment, contrary to what she was promised.

80. The aggregate effect of the treatment Plaintiff received from Aegis in combination with the environment she was placed in by Aegis caused Plaintiff to suffer emotional distress.

81. Before Plaintiff was allowed to leave India, she was forced to conduct an exit interview.

82. The interview was videotaped.

83. Plaintiff was made to feel that if she did not participate in the exit interview she would not be allowed to leave India.

84. Plaintiff was forced to recount her experience in India in a positive way.

85. Upon information and belief, Plaintiff believed the video interview would be used to coerce future employees into participating in the program.

86. The exit interview was stopped early because Plaintiff became very upset.

### *Upon Her Return to Joplin:*

87. Plaintiff completed the program and returned to Joplin.

88. Plaintiff was placed in the "ACE Blue" program but her job duties remained the same and she did not immediately start supervisor training upon her return to Joplin despite such representation being made prior to her departure.

89. Plaintiff continued to suffer emotional distress upon her return to Joplin.

90. Upon information and belief, Defendant created and implemented the Aegis University Study abroad program in order to obtain labor services from American employees by enticing them to travel to India where they would be dependent upon Defendant and be compelled to provide labor at little cost to Defendant.

### COUNT I:
### FRAUDULENT INDUCEMENT AND MISREPRESENTATION
### IN EMPLOYMENT NEGOTIATIONS

91. Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

92. Defendant made the following representations to Plaintiff:

   a. She was told she would receive a stipend 100 dollars on the first of every month;
   b. She was told she would receive a calling card worth 500 rupees on the first of every month;
   c. She was told she would be living on a college campus in a dormitory;
   d. She was told that while in India she would be working part-time hours;
   e. She was told she would regularly attend classes with live instructors;
   f. She was told she would receive three meals per day;
   g. She was told she would be provided with healthcare coverage by Aegis;
   h. She was told she would be placed in the "ACE" program upon her return to Joplin.

93. The representations made by the Defendant were false in the following ways:

   a. Plaintiff was paid 4500 rupees per month without consideration of the exchange rate, which meant she did not receive $100 per month, and the payment was not made on the first of every month;
   b. Plaintiff did not receive a calling card on the first of every month;
   c. Plaintiff did not live on a college campus, but instead was placed in a public hostel;
   d. Plaintiff worked full-time hours upon arrival and her hours progressively increased throughout the duration of the program;
   e. Plaintiff did not regularly attend classes with live instructors, her only live instruction lasted three days;
   f. Plaintiff did not receive three meals per day and the meals were not provided by Aegis;
   g. Plaintiff had to pay for her own medical expenses on multiple occasions:

      i. Upon her hospitalization for E. Coli Plaintiff had to pay to be released from the hospital because Aegis' healthcare plan unpaid by Aegis;
      ii. Plaintiff had to pay for her entire dental bill when she had to have work done to her teeth because of decay caused by an all starch diet.

   h. Plaintiff was placed in the "ACE Blue" program but her job duties remained the same.

94. Each and every representation was material because each benefit of the program influenced Plaintiff to participate in the program. If Plaintiff would have known the untruthfulness of any representation, she would have refused to participate in the program.

95. Defendant knew the representations were false and/or were ignorant to the matter.

96. Defendant never intended to pay $100 per month in that the pay was 4500 rupees, and payment was intentionally suspended until the exchange rate favored Defendant.

97. Defendant intentionally increased the work hours, and decreased the educational hours, thereby misleading Plaintiff about the amount of work she would be performing.

98. Defendant intentionally underpaid the hostel responsible for feeding Plaintiff thereby failing to provide three meals per day.

99. Defendant intended each representation to be acted upon by Plaintiff. The representations were made verbally and in writing to Plaintiff before she decided to participate, the Academy was presented as a valuable educational experience, and the representations were intended to persuade Plaintiff into participating.

100. Plaintiff did not know that the representations made to her were false. There was no way that she could have discovered the falsity of the representations before she decided to attend the Academy.

101. Plaintiff relied on each representation in her decision to participate in the program and attend the Academy.

102. The representations were made to Plaintiff by her immediate employer and Aegis corporate representatives; therefore, she had the right to trust in and rely on Defendant's representations.

103. Plaintiff suffered injuries because of the Defendant's fraudulent misrepresentations. These injuries were proximately caused by Defendant's misrepresentations.

104. The actions and conduct set forth herein were outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others, and therefore Plaintiff is entitled to punitive damages from Defendant, to punish Defendant and to deter Defendant and others from similar conduct.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant on Count I of the Petition, and prays for compensatory and punitive damages, costs expended, for prejudgment and post-judgment interest as provided by law, and other relief as this Court deems just, proper, and equitable.

## COUNT II:
## NEGLIGENT MISREPRESENTATION

105. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

106. In regards to the representations asserted in Count I, any representation not known to be false by Defendant was, in fact, false because of Defendant's lack of reasonable care in making the representations to Plaintiff.

107. Defendant intentionally provided the information to Plaintiff.

108. Plaintiff justifiably relied on the representations.

109. Plaintiff's reliance resulted in loss to her person: physically, emotionally, and economically.

110. The actions and conduct set forth herein were outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others, and therefore Plaintiff is entitled to punitive damages from Defendant, to punish Defendant and to deter Defendant and others from similar conduct.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant on Count II of the Petition, and prays for compensatory and punitive damages, costs expended, for prejudgment and post-judgment interest as provided by law, and other relief as this Court deems just, proper, and equitable.

## COUNT III:
## HUMAN TRAFFICKING
## (18 U.S.C. §§ 1589; 1595)

111. Plaintiff incorporates by reference each and every preceding paragraph and thereby restates the same as if completely restated herein.

112. It is unlawful for individuals or entities to obtain the labor or services of others by means of any scheme, plan, or pattern intended to cause persons to believe that if they do not perform the service or labor, they will suffer serious harm, including physical, psychological, and financial harm. 18 U.S.C. § 1589.

113. 18 U.S.C. § 1595 provides a civil remedy to individuals who have been forced to perform labor or services in a manner described in the preceding paragraph.

114. Defendant's utilization of "Aegis University," the fraudulent misrepresentations, and the mistreatment of Plaintiff alleged herein constituted a scheme, plan, and/or pattern intended to cause Plaintiff and others to believe if they did not provide labor for defendant that she would suffer severe harm.

115. Plaintiff was tricked into participating in the study abroad program by the fraudulent conduct described above.

116. Plaintiff informed Defendant, and thereby Defendant knew that it was obtaining labor from Plaintiff by improper means.

117. Alternatively, Defendant showed a reckless disregard for the fact that the Aegis University study abroad program was implemented in order to obtain labor by causing persons such as Plaintiff to believe serious harm would result from their refusal to perform services and labor for Defendant.

118. Defendant was not candid in its representation of the experience of studying at Aegis University when it convinced Plaintiff to apply for the program.

119. Once Plaintiff was living in India, she was forced to work or else she would be terminated from the program.

120. Plaintiff was told by Defendant that if she did not continue to work in India for 4500 Rupees per month, she would lose her job in Joplin, Missouri and be responsible for all costs associated with her trip to India.

121. Plaintiff was financially unable to pay for the costs of the trip and would be unable to support herself if she returned to Joplin unemployed.

122. As a result of the tornado and widespread devastation in Joplin, Missouri, Plaintiff feared she would be unable to find another job upon returning to Joplin.

123. A reasonable person of the same background and in the same circumstances as Plaintiff would have felt compelled to perform or continue performing labor or services in order to avoid physical, psychological, and/or financial harm.

124. The actions and conduct set forth herein were outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and

others, and therefore Plaintiff is entitled to punitive damages from Defendant, to punish Defendant and to deter Defendant and others from similar conduct.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant on Count III of the Petition, and prays for compensatory and punitive damages, attorney's fees, costs expended, prejudgment and post-judgment interest as provided by law, and other relief as this Court deems just, proper, and equitable.

## COUNT IV:
## UNJUST ENRICHMENT

125. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

126. Plaintiff conferred a benefit onto the Defendant by providing labor services to Defendant.

127. Plaintiff was compensated with less than 100 dollars per month.

128. The services Plaintiff provided for Defendant were more valuable than 100 dollars per month.

129. The number of hours Plaintiff was required to work far exceeded the quantity initially represented to her by Defendant and the quantity that Plaintiff initially agreed to.

130. The Defendant accepted and retained the benefit of Plaintiff's services. The Defendant received labor at a discount price because of the situation in which it placed Plaintiff.

131. The Defendant's retention of the benefit would be unjust. Plaintiff expected to receive quality education from Cornell University while she was abroad in

India, however the educational materials provided were elementary and she never received any instruction from professors or instructors as promised.

132. Plaintiff performed her end of the bargain, but did not receive in return the compensation she expected, and therefore, the Defendant's retention of the benefit would be unjust and/or inequitable.

133. Plaintiff received less than what she expected for her services because of the Defendant's misconduct.

134. The actions and conduct set forth herein were outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others, and therefore Plaintiff is entitled to punitive damages from defendant, to punish Defendant and to deter Defendant and others from similar conduct.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant on Count IV, and prays for compensatory and punitive damages, costs expended, for prejudgment and post-judgment interest as provided by law, and other relief as this Court deems just, proper, and equitable.

## COUNT V:
## BREACH OF CONTRACT

135. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

136. An implied contractual agreement existed between Plaintiff and Defendant, the terms and conditions of which included, but were not limited to, an agreement by Plaintiff to perform labor and services for Defendant in exchange for adequate housing on a college campus, three meals per day, timely pay of 100 dollars per month and SIM card worth 500 rupees.

137. The terms and conditions of the contract between Plaintiff and Defendant also included an agreement that Plaintiff would be placed in the ACE program – a supervisor training program – upon her return to Joplin, Missouri.

138. Plaintiff was not provided with: adequate housing on a college campus; three meals per day; timely payment or SIM Card; or an educational program with access to instructors.

139. Plaintiff was not placed in the ACE program upon her return to Joplin, Missouri.

140. The agreement was made between competent parties and contained mutual obligations and valid consideration. Plaintiff performed all conditions precedent, if any, required of her under the implied agreement.

141. Defendant failed and refused to perform its obligations in accordance with the terms and conditions of the implied agreement by failing to compensate Plaintiff in a timely fashion, providing inadequate housing that was not located on a college campus, serving Plaintiff less food than agreed upon and that was unfit for human consumption, failing to provide instructors to assist the educational program, requiring Plaintiff to work more hours than agreed upon and shifts that were different than represented, and failing to place Plaintiff in a supervisor position or training program upon her return to Joplin.

142. Plaintiff suffered damages from Defendant's breach in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendant on Count V of the Petition and prays for compensatory damages; pre-judgment and

post-judgment interest as provided by law; and such other relief the Court deems fair and equitable.

                            HOLMAN SCHIAVONE, LLC

                   By: */s/ Anne Schiavone*
                         Anne Schiavone, MO Bar# 49349
                         Matt J. O'Laughlin, MO Bar#54025
                         Kelly McCambridge, MO Bar# 60839
                         4600 Madison Avenue, Suite 810
                         Kansas City, Missouri 64112
                         Telephone: 816.283.8738
                         Facsimile: 816.283.8739
                         Email: aschiavone@hslawllc.com
                         Email: molaughlin@hslawllc.com
                         Email: kmccambridge@hslawllc.com

                         ATTORNEYS FOR PLAINTIFF