## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| MANDI J. FRIEND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AEGIS COMMUNICATIONS GROUP, et al., | ) | |
| Serve Registered Agent: | ) | |
|     Registered Agent Solutions, Inc. | ) | Case No. 13-cv-5054 |
|     3225-A Emerald Lane | ) | |
|     Jefferson City, MO 65109 | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| and | ) | |
| | ) | |
| AEGIS USA, INC., | ) | |
| Serve Registered Agent: | ) | |
|     Registered Agent Solutions, Inc. | ) | |
|     900 Old Roswell Lakes Pkwy, Ste. 310 | ) | |
|     Roswell, GA 30076 | ) | |
| | ) | |
| Defendants. | ) | |

## MORE DEFINITE SECOND AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff, Mandi Friend, by and through her attorneys, and submits her More Definite Second Amended Complaint for Damages against Defendants Aegis Communications Group, LLC ("ACG") and Aegis USA, Inc. ("Aegis USA"). In support thereof, she states and alleges the following:

## STATEMENT OF THE CASE

Plaintiff seeks monetary damages, compensatory and punitive, in this case to redress her injuries and damage sustained as a result of Defendants' fraudulent and negligent misrepresentations, unjust enrichment, forced labor, and breach of implied contract.

## PARTIES

1. Plaintiff, Ms. Mandi Jo Friend, is and was at all times mentioned herein a resident and citizen of the state of Missouri.

2. At all times mentioned herein, and for the four years preceding, Plaintiff was an employee of Defendant, ACG.

3. ACG is a Delaware Limited Liability Company with its principal place of business in Texas, is registered to do business in Missouri, and can be served through its registered agent. Its registered agent is Registered Agent Solutions, Inc., located at the address included in the caption.

4. At all times mentioned herein, before and after, all individually described perpetrators were agents, servants, and employees of Defendant ACG and were at all such times acting within the scope and course of their agency and employment, and/or the actions were expressly authorized by ACG and/or their actions were ratified by ACG, thus making ACG liable for said actions under the doctrine of respondeat superior.

## PARTY ADDED VIA AMENDMENT

5. Aegis USA is a Delaware Corporation with its principal place of business in Georgia. Its registered agent is Registered Agent Solutions, Inc., which is located at the address indicated above.

6. Aegis USA is the parent corporation of ACG.

7. Upon information and belief, Aegis USA controls the conduct of ACG, as is jointly responsible for the tortious representations and conduct alleged herein. For example, based on reasonable belief, Plaintiff alleges ACG made misrepresentations to Plaintiff according to Aegis USA's instructions.

8.     Upon information and belief, Aegis USA made decisions regarding and is responsible for the implementation of Aegis Global Academy, the terms and conditions thereof, and the representations made to employees such as Plaintiff, which were intended to induce Plaintiff and others to travel to India.

9.     By supplying the material and information used to make representations to Plaintiff about the study abroad program in India, Aegis USA participated in the plan that was implemented to unlawfully obtain Plaintiff's labor in India (see Count III). Aegis USA's participation in such plan was financially motivated.

10.     Upon information and belief, Aegis USA was aware of the circumstances surrounding Plaintiff's labor while in India, or showed a reckless disregard for the conditions Plaintiff would be exposed to as a result of her reliance on Aegis USA's representations.

11.     At all times mentioned herein, before and after, all individually described perpetrators were agents, servants, and employees of Defendant Aegis USA were at all such times acting within the scope and course of their agency and employment, and/or the actions were expressly authorized by Aegis USA and/or their actions were ratified by Aegis USA, thus making Aegis USA liable for said actions under the doctrine of respondeat superior.

## **JURISDICTION AND VENUE**

12.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because the parties are diverse in state citizenship and the amount in controversy is greater than $75,000.00.

13.     Additionally, there is a substantial federal question presented in this Complaint giving this Court jurisdiction pursuant to 28 U.S.C. § 1331.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this claim occurred in this judicial district.

15.     ACG is authorized to do business in and has purposely availed itself within Missouri and this judicial district, and the Plaintiff's claims arise out of these contacts, therefore Defendant is subject to personal jurisdiction within this Court.

16.     Aegis USA committed tortious acts in Missouri, which are complained of herein, and include the fraudulent misrepresentations alleged by Plaintiff.

## FACTS COMMON TO ALL COUNTS

### *While in the United States:*

17.     Plaintiff worked at the call center owned and operated by Defendants in Joplin, Missouri.  Her employment began during or around September, 2008.

18.     During her employment, Plaintiff noticed a flyer posted in the workplace about a study abroad program.  Upon information and belief, this program was being offered by ACG, Aegis USA, or both.

19.     Deborah Zismer, head of Human Resources in Joplin, provided additional information to Plaintiff and other employees with what she purported to be a valuable educational opportunity.

20.     Upon information and belief, Deborah Zismer is an employee of ACG, Aegis USA, or both.

21.     The purportedly valuable opportunity was the chance to apply for enrollment in a one-year study abroad program at Aegis Global Academy ("Academy").

22.     The Academy is located in Coimbatore, India.

23.     The program would cost Plaintiff nothing.  She would receive a stipend and be provided living quarters in exchange for working minimal hours.

24.     Upon completion of the study abroad program, Plaintiff would receive a Certificate in Program Management from Cornell University.

25.     Pursuant to a written agreement Plaintiff entered into with ACG, upon completion of the program and return to Joplin, she was to be placed in the "ACE Blue" program, which is a supervisor training program.

26.     Plaintiff applied for the study abroad program, but was not initially offered an interview or otherwise selected.

27.     Plaintiff attempted to contact Ms. Zismer in Human Resources to inquire as to why she was not selected, but she was unable to establish communication.

28.     On May 22, 2011 a devastating tornado struck Joplin, Missouri.

29.     Defendants' employees from across the nation donated supplies for use by ACG employees in Joplin, Missouri.

30.     While Plaintiff was at the Joplin location gathering personal hygiene supplies, Drew Balentine from HR asked Plaintiff if she was still interested in the study abroad program. Upon information and belief, Balentine works for ACG, Aegis USA, or both.

31.     Balentine, Zismer, and other individuals responsible for selecting individuals to participate in the Academy program, who were also employees of one or both Defendants, knew or should have known Plaintiff was financially struggling after the Joplin tornado.

32.     Shortly thereafter, Plaintiff had a phone interview.  At the conclusion of the interview, Plaintiff's interviewer told Plaintiff to tell Zismer to get Plaintiff's passport ready.

33.     After learning that she was accepted to the program, Plaintiff inquired about additional information from Deborah Zismer, Drew Balentine, and David Curtis. Upon information and belief, Curtis is an employee of ACG, Aegis USA, or both.

### *What Defendants Told Plaintiff about the Program:*

34.     Plaintiff was told the program would be a great career advancement opportunity, because she would be trained in management.

35.     Plaintiff was required to sign a leave of absence form with the Joplin office before her departure.

36.     On or around August 12, 2011 Plaintiff flew out of Joplin, Missouri to Dallas, Texas, where she received additional information before traveling to India. Upon information and belief, the Dallas facility is owned and operated by ACG, Aegis USA, or both.

37.     Plaintiff was provided with booklets that included information about the Academy program.

38.     Plaintiff learned while in Texas that if she returned early or did not otherwise complete the entire program she would be financially responsible for the entire trip.

39.     Plaintiff was told by Shrinvas Shetti that she would be regularly attending classes taught by live instructors.  Upon information and belief, Shetti is an employee of Aegis USA, ACG, or both.

40.     Plaintiff was told she would be living on a college campus while in India.

41.     Plaintiff was warned that electricity "might go out from time to time" during her stay in India.

42.     Plaintiff was told she would be provided with three meals per day while in India.

43.     In addition to completing online classes, Plaintiff understood she would be working part-time, performing the same duties that she had previously been performing while in Joplin, Missouri.

44.     Plaintiff was told that she would be paid a stipend of 100 U.S. dollars per month.

45.     Plaintiff was told that she would receive a SIM card (a pre-paid calling card) worth 500 rupees each month at the same time she received the stipend.

46.     The stipend and SIM card were to be received on the first of every month during the Academy program.

47.     Aegis employees, including Plaintiff's supervisors, completed all the necessary paperwork and acquired the necessary documents for Plaintiff to travel to India.

48.     After briefly staying in Texas, Plaintiff flew to India.

49.     Plaintiff was instructed to tell Indian Customs Agents that she was traveling to India for a six month business trip, even though Plaintiff was lead to believe, by Defendants' employees, that she was traveling to India for a one year educational program.

### *The Events that Took Place in India:*

50.     Upon her arrival to India, Plaintiff discovered she was sent there upon a work visa, not a student visa.

51.     Plaintiff was placed in a public hostel, not a college dormitory.  Her living quarters were not on a college campus.

52.     Plaintiff began working at a call center the second day she was in India, and was required to work for the following eleven days.

53.     Plaintiff performed the same job in India as she did when she was in Joplin, but her hours were different so that she could be on the phones during the business hours she worked when she was in Joplin.

54.     While in India, Plaintiff responded to the same client base as she did when she was in India.

55.     Plaintiff was offered online educational courses after two months of labor.

56.     Plaintiff's first instruction on management training commenced six months after her arrival to Aegis University in India.

57.     Plaintiff did not have any classroom instruction from any professor or instructor while in India.

58.     Plaintiff observed Indian students, who were supposed to be attending Aegis University alongside the American exchange students, attend classes on a daily basis and were not required to work in the call center.

59.     Plaintiff was forced to work more than forty hours per week.

60.     The electricity in Plaintiff's living quarters went out frequently, for up to 24 hours at a time.

61.     Meals were not provided by Defendants, but by the hostel management.

62.     The meals were not adequate and were not consistent with the information Plaintiff received while she was still in the United States.

63.     Even though at the beginning of the program Plaintiff received three meals per day, she soon began to receive only two meals per day.

64.     Friend asked the hostel management why she was no longer receiving three meals per day.  She was told that Aegis stopped paying the hostel enough for three meals per day.

65.     Plaintiff was not allowed to attend church on Sundays because:

   a.  She was forced to work instead; and
   b.  Aegis would not pay for transportation to church services.

66.     Despite being told she would receive 100 U.S. dollars per month, Plaintiff received 4500 rupees per month.  This payment in rupees was not altered to reflect the change in the exchange rate from dollars to rupees.

67.     The stipend and phone minutes were not provided on the first of the month as they were supposed to.

68.     On one occasion, Plaintiff was told that she would not be receiving payment because it was an Indian holiday.  Upon her own inquiry, she learned there was no national holiday on that day.

69.     The food provided to Plaintiff was often spoiled, rotten, and/or tainted and therefore unsafe for human consumption.

70.     Plaintiff contracted E. Coli as a result of the food she was served and was hospitalized for three days.

71.     Plaintiff made several complaints to the Standing Representatives at Aegis University and to Human Resources employees in Joplin, Missouri regarding the living

and working conditions, the food she was served, and how the overall treatment she was receiving was materially different than what was presented to her while in America.

72.    Plaintiff complained to Shaun Chettiar about the living and working conditions and the food she was served, and how the overall treatment she was receiving was materially different than what was presented to her while in America.

73.    Plaintiff had two meetings with Essar executives, wherein she complained of the living working conditions and the food she was served.  Essar is the parent company of both ACG and Aegis USA.

74.    Plaintiff complained to Deborah Zismer, HR in Joplin.

75.    Plaintiff explained to Zismer how the treatment she was receiving in India was different than what she was told before agreeing to travel there.  Specifically, Plaintiff told Zismer about the excessive hours, delayed pay, housing, and inadequate responses to her requests, mainly that the response was that she could return to America at her own expense.

76.    Deborah Zismer was provided with information from Plaintiff that should have made Zismer aware of the conditions Plaintiff was exposed to in India and how the experience was not as what was explained to Plaintiff before traveling to India.

77.    Zismer told Plaintiff she was unable to help Plaintiff, as the situation was out of her (Zismer's) control.

78.    None of Plaintiff's complaints were responded to.

79.    Plaintiff asked to go home at least five times while she was at Aegis University in India.

80.    Plaintiff was informed that if she wanted to leave, she would have to quit the program and her job, and finance her own way back to the United States.

81.     Plaintiff was informed that Defendants had no legal responsibility to ensure she returned to the United States safely if she did not continue to work and complete the program.

82.     Plaintiff was reminded of the clause in the booklet that said if she did not complete the program she would owe money for the entire trip.

83.     Chettiar told Plaintiff if she went back to the United States early, she would have no job waiting for her.

84.     Plaintiff was intimidated and feared she would suffer sufficiently serious harm if she did not continue to provide labor and services to Aegis, and therefore, Plaintiff continued to work against her will.

85.     Plaintiff knew that a co-worker in India had refused to continue working in these conditions and as a result this employee was not fed and Defendants refused to send him home.  At the time this employee was refusing to work, he was left to fend for himself with little to no money.

86.     Plaintiff's fear of serious harm was enhanced by her background and the circumstances surrounding her enrollment in the study abroad program and the events that occurred in Joplin shortly before that, including the tornado.

87.     Plaintiff feared that if she did not continue to work, Defendants would withhold food, medical attention, and housing from her.

88.     Plaintiff feared that if she did not continue to work, she would return to America without money or employment, contrary to what she was promised.

89.     The aggregate effect of the treatment Plaintiff received from Aegis in combination with the environment she was placed in by Aegis caused Plaintiff to suffer emotional distress.

90. Before Plaintiff was allowed to leave India, she was forced to conduct an exit interview.

91. The interview was videotaped.

92. Plaintiff was made to feel that if she did not participate in the exit interview she would not be allowed to leave India.

93. Plaintiff was forced to recount her experience in India in a positive way.

94. Upon information and belief, Plaintiff believed the video interview would be used to coerce future employees into participating in the program.

95. The exit interview was stopped early because Plaintiff became very upset.

### Upon Her Return to Joplin:

96. Plaintiff completed the program and returned to Joplin.

97. Plaintiff was placed in the "ACE Blue" program but her job duties remained the same and she did not immediately start supervisor training upon her return to Joplin despite such representation being made prior to her departure.

98. Plaintiff continued to suffer emotional distress upon her return to Joplin.

99. Upon information and belief, Defendants created and implemented the Aegis University study abroad program in order to obtain labor services from American employees by enticing them to travel to India where they would be dependent upon Defendants and be compelled to provide labor at little cost to Defendants.

100. Upon information and belief, ACG, Aegis USA, or both, were in control of Aegis University in India. Regardless, Plaintiff has reason to believe and therefore alleges that ACG and Aegis USA benefitted financially from Plaintiff's participation in the study-abroad program.

## COUNT I:
## FRAUDULENT INDUCEMENT AND MISREPRESENTATION
## IN EMPLOYMENT NEGOTIATIONS

101.    Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

102.    Upon information and belief, Aegis USA and ACG together made the following representations to Plaintiff, Aegis USA provided the written materials and documents, including power point presentations, fliers, and memoranda to ACG employees.  The verbal representations were made to Plaintiff by employees of ACG, Aegis USA, or both.

103.    Defendants, as described above, made the following representations to Plaintiff:

   a. She was told she would receive a stipend 100 dollars on the first of every month;
   b. She was told she would receive a calling card worth 500 rupees on the first of every month;
   c. She was told she would be living on a college campus in a dormitory;
   d. She was told that while in India she would be working part-time hours;
   e. She was told she would regularly attend classes with live instructors;
   f. She was told she would receive three meals per day;
   g. She was told she would be provided with healthcare coverage by Aegis; and
   h. She was told she would be placed in the "ACE" program upon her return to Joplin.

104.    The representations made to Plaintiff were false in the following ways:

   a. Plaintiff was paid 4500 rupees per month without consideration of the exchange rate, which meant she did not receive $100 per month, and the payment was not made on the first of every month;
   b. Plaintiff did not receive a calling card on the first of every month;
   c. Plaintiff did not live on a college campus, but instead was placed in a public hostel;
   d. Plaintiff worked full-time hours upon arrival and her hours progressively increased throughout the duration of the program;
   e. Plaintiff did not regularly attend classes with live instructors, her only live instruction lasted three days;

    f.   Plaintiff did not receive three meals per day and the meals were not provided by Aegis;

    g.   Plaintiff had to pay for her own medical expenses on multiple occasions;

         i.   Upon her hospitalization for E. Coli Plaintiff had to pay to be released from the hospital because Aegis' healthcare plan unpaid by Aegis; and

        ii.   Plaintiff had to pay for her entire dental bill when she had to have work done to her teeth because of decay caused by an all starch diet.

    h.   Plaintiff was placed in the "ACE Blue" program but her job duties remained the same.

105.    Upon information and belief, Aegis USA created the information and materials used to make these representations.

106.    Upon information and belief, ACG adopted these representations as their own when its agents decided to represent to Plaintiff that the substance contained therein was true and accurate.

107.    Each and every representation was material because each benefit of the program influenced Plaintiff to participate in the program. If Plaintiff would have known the untruthfulness of any representation, she would have refused to participate in the program.

108.    Defendants knew the representations were false and/or were ignorant to the matter.

109.    Defendants never intended to pay $100 per month in that the pay was 4500 rupees, and payment was intentionally suspended until the exchange rate favored Defendant.

110.    Defendants intentionally increased the work hours, and decreased the educational hours, thereby misleading Plaintiff about the amount of work she would be performing.

111.    Defendants intentionally underpaid the hostel responsible for feeding Plaintiff thereby failing to provide three meals per day.

112.    Defendants intended each representation to be acted upon by Plaintiff. The representations were made verbally and in writing to Plaintiff before she decided to participate, the Academy was presented as a valuable educational experience, and the representations were intended to persuade Plaintiff into participating.

113.    Plaintiff did not know that the representations made to her were false. There was no way that she could have discovered the falsity of the representations before she decided to attend the Academy.

114.    Plaintiff relied on each representation in her decision to participate in the program and attend the Academy.

115.    The representations were made to Plaintiff by her immediate employer and corporate representatives; therefore, she had the right to trust in and rely on the representations.

116.    Plaintiff suffered injuries because of the Defendants' fraudulent misrepresentations.    These injuries were proximately caused by Defendants' misrepresentations.

117.    The actions and conduct set forth herein were outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others, and therefore Plaintiff is entitled to punitive damages from Defendants, to punish Defendants and to deter Defendants and others from similar conduct.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants on Count I of the Petition, and prays for compensatory and punitive damages, costs

expended, for prejudgment and post-judgment interest as provided by law, and other relief as this Court deems just, proper, and equitable.

## COUNT II:
## NEGLIGENT MISREPRESENTATION

118.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

119.    In regards to the representations asserted in Count I, any representation not known to be false by Defendants was, in fact, false because of Defendants' lack of reasonable care in making the representations to Plaintiff.

120.    Defendants ACG and Aegis USA intentionally provided the information to Plaintiff.

121.    Aegis USA supplied ACG with material and information used to make representations to Plaintiff.  This information was supplied within the course and scope of Aegis USA's business.

122.    Aegis USA had a duty to verify the accuracy of information it was supplying to ACG, which it knew would be used to make representations to Plaintiff and other ACG employees.

123.    Aegisu USA failed to verify the accuracy of the information it provided to ACG.

124.    ACG and Aegis USA provided Plaintiff this information within the scope of their business.

125.    ACG had a duty to ensure the accuracy of the information it provided to its employees during employment negotiations and used to persuade Plaintiff to participate in the Academy program.

126.     ACG failed to take reasonable measures to verify the accuracy of the information it provided to Plaintiff.

127.     Plaintiff justifiably relied on the representations as she was not in a position to discover the truth of the representations and she was owed a duty by both Aegis USA and ACG as her employers.

128.     Plaintiff's reliance resulted in loss to her person: physically, emotionally, and economically.

129.     Due to Defendants' negligence, Plaintiff was forced to provide labor under the threat of serious harm and/or because she reasonably believed if she stopped providing labor in violation of federal law she would suffer serious harm.

130.     The actions and conduct set forth herein were outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others, and therefore Plaintiff is entitled to punitive damages from Defendants, to punish Defendants and to deter them and others from similar conduct.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants on Count II of the Petition, and prays for compensatory and punitive damages, costs expended, for prejudgment and post-judgment interest as provided by law, and other relief as this Court deems just, proper, and equitable.

## COUNT III:
### FORCED LABOR
### (18 U.S.C. §§ 1589; 1595)

131.     Plaintiff incorporates by reference each and every preceding paragraph and thereby restates the same as if completely restated herein.

132.     It is unlawful for individuals or entities to obtain the labor or services of others by means of any scheme, plan, or pattern intended to cause persons to believe

that if they do not perform the service or labor, they will suffer serious harm, including physical, psychological, and financial harm.  18 U.S.C. § 1589.

133.    18 U.S.C. § 1595 provides a civil remedy to individuals who have been forced to perform labor or services in a manner described in the preceding paragraph.

134.    Defendants' utilization of "Aegis University," the fraudulent misrepresentations, and the mistreatment of Plaintiff alleged herein constituted a scheme, plan, and/or pattern intended to cause Plaintiff and others to believe if they did not provide labor for defendant that she would suffer severe harm.

135.    Plaintiff was tricked into participating in the study abroad program by the fraudulent conduct described above.

136.    Plaintiff informed Defendants, and thereby Defendants knew Plaintiff was being forced to provide labor against her will.

137.    Alternatively, Defendants showed a reckless disregard for the fact that the Aegis University study abroad program was implemented in order to obtain labor by causing persons such as Plaintiff to believe serious harm would result from their refusal to perform services and labor for Defendants.

138.    Defendants were not candid in its representation of the experience of studying at Aegis University when it convinced Plaintiff to apply for the program.

139.    Once Plaintiff was living in India, she was forced to work or else she would be terminated from the program.

140.    Plaintiff was told by Defendants that if she did not continue to work in India for 4500 Rupees per month, she would lose her job in Joplin, Missouri and be responsible for all costs associated with her trip to India.

141.     Plaintiff was financially unable to pay for the costs of the trip and would be unable to support herself if she returned to Joplin unemployed.

142.     As a result of the tornado and widespread devastation in Joplin, Missouri, Plaintiff feared she would be unable to find another job upon returning to Joplin.

143.     A reasonable person of the same background and in the same circumstances as Plaintiff would have felt compelled to perform or continue performing labor or services in order to avoid physical, psychological, and/or financial harm.

144.     Alternatively, Defendants ACG and Aegis USA were not responsible for the operation of Aegis University, and were not obtaining labor from Plaintiff first-hand, but are still liable because they benefitted from a venture designed and utilized to obtain forced labor from Plaintiff that they knew or should have known, or showed reckless disregard for the fact that it was used in such a manner.

145.     Defendants participated in the venture:

a. Aegis USA participated in the venture by supplying the information and materials used to make representations to Plaintiff which enticed her to travel to India; and

b. ACG participated in the venture by making representations to Plaintiff, hosting and interview process, selecting her to participate, obtaining the proper documentation to allow Plaintiff to travel to India, and refusing to allow Plaintiff to return to her employment in Joplin after she expressed her desire to leave India.

146.     Upon information and belief, Defendants benefitted from Plaintiff's participation in the venture by receiving money or something of financial value as an incentive to encourage Plaintiff's participation, including but not limited to compensation for initiating and carrying out an application and interview process.

147.     Aegis USA and ACG knew or showed reckless disregard for the fact that the Aegis University program was designed primarily to obtain labor from Plaintiff and

others against their will, as Plaintiff made complaints to individuals who worked for each Defendant, or the complaints made by Plaintiff to ACG were relayed to Aegis USA.

148. The actions and conduct set forth herein were outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others, and therefore Plaintiff is entitled to punitive damages from Defendants, to punish Defendants and to deter than and others from similar conduct.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants on Count III of the Petition, and prays for compensatory and punitive damages, attorney's fees, costs expended, prejudgment and post-judgment interest as provided by law, and other relief as this Court deems just, proper, and equitable.

## COUNT IV:
## UNJUST ENRICHMENT

149. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

150. Plaintiff conferred a benefit onto the Defendants by providing labor services to Defendants.

151. Alternatively, Defendants received a different benefit as a result of her participation in the Aegis University program in India.

152. Plaintiff was compensated with less than 100 dollars per month.

153. The services Plaintiff provided were more valuable than 100 dollars per month.

154. The number of hours Plaintiff was required to work far exceeded the quantity initially represented to her by Defendants and the quantity that Plaintiff initially agreed to.

155. Defendants accepted and retained the benefit of Plaintiff's services. Defendants received labor at a discount price because of the situation in which it placed Plaintiff. Alternatively, they accepted and retained the benefit conferred upon them by the entity responsible for Aegis University.

156. Defendants' retention of the benefit would be unjust. Plaintiff expected to receive quality education from Cornell University while she was abroad in India, however the educational materials provided were elementary and she never received any instruction from professors or instructors as promised. In addition, Plaintiff's participation was obtained by the Defendants' misrepresentations, as outlined above,

157. Plaintiff performed her end of the bargain, but did not receive in return the compensation she expected, and therefore, the Defendants' retention of the benefit would be unjust and/or inequitable.

158. Plaintiff received less than what she expected for her services because of Defendants' misconduct.

159. The actions and conduct set forth herein were outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others, and therefore Plaintiff is entitled to punitive damages from Defendants, to punish Defendants and to deter them and others from similar conduct.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants on Count IV, and prays for compensatory and punitive damages, costs expended, for prejudgment and post-judgment interest as provided by law, and other relief as this Court deems just, proper, and equitable.

## COUNT V:
## BREACH OF CONTRACT

160.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

161.    An implied contractual agreement existed between Plaintiff and Defendants, the terms and conditions of which included, but were not limited to, an agreement by Plaintiff to perform labor and services for Defendants in exchange for adequate housing on a college campus, three meals per day, timely pay of 100 dollars per month and SIM card worth 500 rupees.

162.    The terms and conditions of the contract between Plaintiff and Defendants also included an agreement that Plaintiff would be placed in the ACE program – a supervisor training program – upon her return to Joplin, Missouri.

163.    Plaintiff was not provided with: adequate housing on a college campus; three meals per day; timely payment or SIM Card; or an educational program with access to instructors.

164.    Plaintiff was not placed in the ACE program upon her return to Joplin, Missouri.

165.    The agreement was made between competent parties and contained mutual obligations and valid consideration.    Plaintiff performed all conditions precedent, if any, required of her under the implied agreement.

166.    Defendants failed and refused to perform its obligations in accordance with the terms and conditions of the implied agreement by failing to compensate Plaintiff in a timely fashion, providing inadequate housing that was not located on a college campus, serving Plaintiff less food than agreed upon and that was unfit for

human consumption, failing to provide instructors to assist the educational program, requiring Plaintiff to work more hours than agreed upon and shifts that were different than represented, and failing to place Plaintiff in a supervisor position or training program upon her return to Joplin.

167.    Plaintiff suffered damages from Defendants' breach in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants on Count V of the Petition and prays for compensatory damages; pre-judgment and post-judgment interest as provided by law; and such other relief the Court deems fair and equitable.

Respectfully Submitted,

HOLMAN SCHIAVONE, LLC

By:  *s/ Anne Schiavone*
Anne Schiavone,       MO Bar# 49349
Matt O' Laughlin,      MO Bar# 54025
Kelly McCambridge,   MO Bar# 60839
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
Email: aschiavone@hslawllc.com
Email: molaughlin@hslawllc.com
Email: kmccambridge@hslawllc.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically to those parties who have entered an appearance in the Court's Electronic Court Filing (ECF) system, and served conventionally via first-class United States mail, postage prepaid to those parties who have requested notice but are not participating in the ECF System, pursuant to Instructions appearing on the Electronic Filing Receipt received from the U.S. District Court for the Western District of Missouri, on this 23rd day of September, 2013.

*s/Anne Schiavone*
ATTORNEY FOR PLAINTIFF