UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| MANDI J. FRIEND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-5054-CV-SW-ODS |
| | ) | |
| AEGIS COMMUNICATIONS GROUP, LLC, | ) | |
| and AEGIS USA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## SUGGESTIONS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ..................................................................................................1

STATEMENT OF UNCONTROVERED MATERIAL FACTS ................................1

ARGUMENT .......................................................................................................11

I.   Defendants are Entitled to Judgment as a Matter of Law on Plaintiff's
     Misrepresentation Claims (Counts I and II) ...................................................11

     A.   Statements regarding the future conduct of third parties are not
          actionable .............................................................................................12

     B.   Misrepresentation claims based on promises of future conduct are
          only actionable if the speaker had actual knowledge that his
          statements were false ...........................................................................14

     C.   Plaintiff did not rely on six of the alleged misrepresentations ...........15

     D.   The two representations upon which Plaintiff could have relied
          were substantially true .........................................................................17

II.  Summary Judgment is Warranted on Plaintiff's Combined Forced Labor
     and Benefitting from Forced Labor Claim (Count III) ..................................19

     A.   The Trafficking Victims Protection Act Does Not Cover
          Plaintiff's Claims .................................................................................19

     B.   Defendants Are Not the Proper Party .....................................................21

     C.   Plaintiff Cannot Establish a Fear of "Serious Harm" ...........................21

     D.   Plaintiff Cannot Establish the Requisite *Scienter* ...............................24

     E.   Plaintiff Cannot Establish that Defendants Knowingly Benefitted
          from Forced Labor .................................................................................26

III. Plaintiff Cannot Establish Unjust Enrichment (Count IV) ...........................27

     A.   Defendants Did Not Receive a Benefit ..................................................27

     B.   Plaintiff Has Failed to Prove the Amount of Any Unjustly
          Retained Benefit .....................................................................................28

     C.   Plaintiff Cannot Establish That Retention of Any Benefit Would

i

        be Unjust ............................................................................................... 29

    D.     A Contract Precludes A Claim for Unjust Enrichment ....................... 29

    E.     Plaintiff's Claim Is Not Actionable as Unjust Enrichment ............... 31

IV.    Plaintiff's Breach of Contract Claim Fails as a Matter of Law (Count V) .................... 32

CONCLUSION ....................................................................................................... 35

**TABLE OF AUTHORITIES**

**Cases**

*Adams v. One Park Place Investors, LLC*, 315 S.W.3d 742 (Mo. App. 2010) ..................... 27, 29

*Ariel Preferred Retail Group, LLC v. CWCapital Asset Management*, 883

  F.Supp.2d 797 (E.D. Mo. 2012) ........................................................................... 29

*Bohac v. Walsh*, 223 S.W.3d 858 (Mo. App. 2007) ................................................... 12

*Burrus v. HBE Corp.*, 211 S.W.3d 613 (Mo. App. 2006) ........................................... 30

*Campbell v. Sheraton Corp. of America*, 253 S.W.2d 106 (Mo. 1952)........................ 34

*Comp & Soft, Inc. v. AT&T Corp.*, 252 S.W.3d 189 (Mo. App. 2008) ....................... 15

*Coverdell v. Countrywide Home Loans, Inc.*, 375 S.W.3d 874 (Mo. App. 2012)............... 16, 17

*Eureka Pipe, Inc. v. Cretcher–Lynch & Co.*, 754 S.W.2d 897 (Mo. App. 1988)........................ 12

*Grossoehme v. Cordell*, 904 S.W.2d 392 (Mo. App. 1995) ........................................ 14

*Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012)....................... 22

*Hoag v. McBride & Son Inv. Co., Inc.*, 967 S.W.2d 157 (Mo. App. 1998)................... 15

*Hoover v. Citizens Home Bank*, 245 S.W.2d 154 (Mo. App. 1951)............................. 33

*Howard v. Turnbull*, 316 S.W.3d 431 (Mo. App. 2010) ........................................ 29, 30

*John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988 (S.D. Ind. 2007) .................... 21

*Johnson Group, Inc. v. Grasso Bros., Inc.*, 939 S.W.2d 28 (Mo. App. 1997)............... 30

*KC Excavating and Grading, Inc. v. Crane Const. Co.*, 141 S.W.3d 401

  (Mo. App. 2004) ................................................................................................ 31

*King v. U.S.*, 595 F.3d 844 (8th Cir. 2010)................................................................ 19

*Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013) ................................... 20

*Lowe v. Hill*, No. WD76272, 2014 WL 2054281 (Mo. App. May 20, 2014)............... 30

*Massie v. Colvin*, 373 S.W.3d 469 (Mo. App. 2012)............................................ 12, 14

*Mello v. Davis*, 182 S.W.3d 622 (Mo. App. 2005) ...................................................................... 30

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) ................................................................ 20

*Miller v. Horn*, 254 S.W.3d 920 (Mo. App. 2008) ...................................................................... 28

*Nattah v. Bush*, 541 F. Supp. 2d 223 (D. D.C. 2008), *aff'd in part, rev'd on other*

    *grounds,* 605 F.3d 1052 (D.C. Cir. 2010) .......................................................................... 21

*Nunag-Tanedo v. East Baton Rouge Parish School Board*, 790 F.Supp.2d 1134

    (C.D. Cal. 2011) ........................................................................................... 19, 22, 23

*R & R Land Dev., L.L.C. v. Am. Freightways, Inc.*, 389 S.W.3d 234

    (Mo. App. 2012) ................................................................................................... 30

*Roebuck v. Valentine-Radford, Inc.*, 956 S.W.2d 329 (Mo. App. 1997) ............................... 28, 31

*Ryann Spencer Grp., Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284

    (Mo. App. 2008) ............................................................................................... 12, 14

*Sindecuse v. Katsaros*, 541 F.3d 801 (8th Cir. 2008) ........................................................... 12, 14

*State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............................... 20

*Steinberg v. Fleischer*, 706 S.W.2d 901 (Mo. App. 1986) .............................................................. 31

*Stevens v. Markirk Const., Inc.*, 2014 WL 211466 (Mo. App. Jan. 21, 2014) ....................... 14, 15

*Tanedo v. East Baton Rouge Parish School Board*, No. SA CV10-01172 JAK,

    2012 WL 5378742 (C.D. Cal. Aug. 27, 2012) ..................................................................... 20

*Thoroughbred Ford, Inc. v. Ford Motor Co.*, 908 S.W.2d 719 (Mo. App. 1995) ....................... 14

*Trotter's Corp. v. Ringleader Rests.*, 929 S.W.2d 935 (Mo. App. 1996) ................................... 14

*U.S. v. Bradley*, 390 F.3d 145 (1st Cir. 2004), *vacated on other grounds,*

    545 U.S. 1101 (2005) ......................................................................................... 21, 22, 27

*U.S. v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) ....................................................... 21, 24, 25, 27

*U.S. v. Dann*, 652 F.3d 1160 (9th Cir. 2011) ............................................................. 21, 22, 25, 27

*U.S. v. Sabhnani*, 599 F.3d 215 (2nd Cir. 2010) ................................................................. 25, 27

*Velder v. Cornerstone Nat. Ins. Co.*, 243 S.W.3d 512 (Mo. App. 2008) .............................. 17, 18

*Waller v. Tootle-Campbell Dry Goods Co.*, 59 S.W.2d 751 (Mo. App. 1933) ..................... 33, 34

*Winslow v. Nolan*, 319 S.W.3d 497 (Mo. App. 2010) ................................................................ 28

**Statutes**

R.S.Mo. § 432.010 .......................................................................................................... 33

**Other Authorities**

MAI 23.05 ........................................................................................................................ 15

The Trafficking Victims Protection Act, 18 U.S.C. §1589 ................................................. passim

**Rules**

Federal Rule of Civil Procedure 56 ................................................................................... 1

v

COME NOW Defendants Aegis Communications Group, LLC, and Aegis USA, Inc., and pursuant to Federal Rule of Civil Procedure 56, jointly submit the following Suggestions in Support of Defendants' Motion for Summary Judgment.

## INTRODUCTION

Plaintiff's Second Amended Complaint includes claims for fraud, negligent misrepresentation, unjust enrichment, breach of contract, and forced labor. For the reasons set forth herein, this Court should grant summary judgment in Defendants' favor and dismiss Plaintiff's claims with prejudice.

## STATEMENT OF UNCONTROVERED MATERIAL FACTS

1.      Aegis Communications Group, LLC ("ACG") was a Delaware limited liability company with its principal place of business in Texas. (Dkt. No. 1-2, ¶ 3)

2.      Aegis USA, Inc. ("Aegis USA") is a Delaware corporation with its principal place of business in Texas. (Exh. A, Shetty Aff. at ¶ 3)

3.      Aegis USA was the sole member of ACG until the companies merged effective as of December 31, 2013. (Exh. B, Lee Dep. at 11; Exh. C, Mullen Dep. at 8; Exh. D, Shetty Dep. at 9)

4.      ACG operated, and Aegis USA now operates, call centers in various locations around the United States. (Exh. B at 14-15, 19-20)

5.      Aegis USA is (and was) owned by Essar Services, a Mauritius company. (Exh. B at 12-13; Exh. E, Lee Dep. Ex. 2)

6.      In turn, Essar Services is owned by Aegis Limited, which is an Indian entity. (Exh. B at 12-13; Exh. E)

7.      Aegis Limited is owned by AGC Holdings Limited in Mauritius. (Exh. B at 12-13; Exh. E)

8.      Aegis Aspire Consultancy Services, Ltd. ("Aegis Aspire"), also an Indian entity, owned and operated Aegis Global Academy in Coimbatore, India. (Exh. B at 12-13, 24-25, 28, 34; Exh. E)

9.      Aegis Aspire is owned by AGC Holdings Limited. (Exh. B at 12-13; Exh. E)

10.     Aegis Aspire is independent of, and not subject to control by, ACG or Aegis USA. (Exh. A, ¶ 4; Exh. D at 117-19, 125, 127, 129-30, 145, 148-49, 152-53, 156, 160; Exh. B at 12-13, 24-25, 28-30, 34; Exh. E; Exh. C at 79-80, 83; Exh. F, Zismer Dep. at 71, 82; Exh. G, Friend Dep. at 195, 200)

11.     Plaintiff began working for ACG in 2008 as a customer service representative at its Joplin, Missouri, call center. (Exh. G at 9-10; More Definite Second Amended Complaint, "Second Am. Compl.," ¶ 17)

12.     Plaintiff took a leave of absence in August 2011 to participate in the Cross-Shoring Program. (Second Am. Compl. ¶ 35; Exh. H, Friend Dep. Exh. 5; Exh. G at 132-33)

13.     The Cross-Shoring Program was intended to be a mutually-beneficial opportunity for employees to gain experience living, working, and studying abroad, while also offering American clients access to American employees at a lower cost to clients. (Exh. F at 12; Exh. C at 15; Exh. D at 14, 20-21, 52)

14.     Despite saving money for its clients, ACG lost money on the Cross-Shoring Program. (Exh. C at 39; Exh. I, Mullen Dep. Ex. 2; Exh. D at 60; Exh. B at 38-41)

15.     In fact, even though Defendants had a gross profit (before overhead and other expenses) in one year, Plaintiff and Defendants stipulated that Defendants sustained a net loss from the Cross-Shoring Program. (Exh. C at 39; Exh. B at 38-41)

16. In 2011, an Aegis USA client expressed interest in purchasing this new type of service. (Exh. C at 18; Exh. D at 27)

17. ACG permitted volunteering employees who were selected after an interview and ranking process to take a leave of absence from their jobs at ACG to participate in the program. (Second Am. Compl., ¶ 35; Exh. C at 20-21; Exh. F at 16)

18. Neither Aegis USA nor ACG had operations in India. (Exh. B at 19-20, 34; Exh. C at 83; Exh. D at 34-35)

19. However, Aegis Aspire, the training subsidiary of AGC Holdings Limited, was operating Aegis Global Academy in India and was contracted with to operate the Cross-Shoring Program. (Exh. B at 24-25, 30, 34; Exh. J, Lee Dep. Ex. 3; Exh. D at 43-44)

20. Aegis Aspire employees in India prepared materials that described the educational opportunity Aegis Aspire had designed, the work experience, and the accommodations that Aegis Aspire had arranged for the participants. (Exh. C at 21; Exh. F at 48; Exh. D at 28-29, 144-45, 179-80)

21. Aegis Aspire sent those materials to ACG management in Texas to be used to introduce the Cross-Shoring Program to ACG employees. (Exh. C at 21; Exh. F at 17-18, 48; Exh. D at 20-21, 28-29, 179-80)

22. No representative of ACG or Aegis USA conducted any independent investigation or altered the Aegis Aspire materials in any way. (Exh. A, ¶ 6; Exh. D at 12, 34, 37-38, 92, 103; Exh. C at 28-29, 36, 38; Exh. F at 48, 54)

23. The Cross-Shoring Program was one year in duration and took place at Aegis Global Academy in Coimbatore, India. (Exh. H; Second Am. Compl., ¶¶ 21, 49)

24. ACG provided transportation to and from India. (Exh. D at 27, 63, 67)

25. Aegis Aspire provided meals, lodging, and transportation in India. (Exh. L, Friend Dep. Ex. 3; Exh. B at 30, 34; Exh. J; Exh. D at 35, 37-38, 101-03)

26. Further, Aegis Aspire provided internet access, a pre-paid cellular phone, and an Indian-based health insurance policy. (Exh. L; Exh. B at 30, 34; Exh. J; Exh. D at 41, 101)

27. Aegis Aspire operated the call center facility within the Aegis Global Academy building and employed, among others, the Cross-Shoring Program participants to staff it. (Exh. B at 12-13, 24-25, 28, 30, 34; Exh. J; Exh. D at 27)

28. Aegis Aspire also provided the educational component. (Exh. L; Exh. B at 30, 34; Exh. J; Exh. D at 41-42)

29. As part of the educational component, Aegis Aspire contracted with Cornell University to provide a customized education through its eCornell program. (Exh. L; Exh. D at 92, 104)

30. Aegis Aspire employed participants to work in a call center doing similar work as they did in the United States. (Exh. H; Second Am. Compl., ¶¶ 43, 53; Exh. D at 97)

31. The participants, as Aegis Aspire employees, started out working six hours per day and gradually increased to full-time. (Exh. D at 107-09)

32. Participants would work overnight during hours in India that correlated to normal business hours in the United States. (Exh. C at 34-35; Exh. D at 109; Exh. G at 145-47)

33. In addition to providing meals, lodging, and transportation in India, Aegis Aspire would provide the participants with $100 per month as a stipend to cover miscellaneous expenses. (Exh. L; Exh. G at 84, 136; Exh. C at 34; Exh. D at 38, 100, 152-54)

34. Participants who completed the program "in good standing" would receive a complimentary vacation excursion in India from Aegis Aspire. (Exh. L; Exh. G at 272)

4

35.     Participants who completed the program in good standing would also receive a $2,000 pre-tax bonus from ACG and would be rehired by ACG in the United States. (Exh. L; Exh. C at 34; Exh. D at 83-84, 120)

36.     In addition, ACG would later place those participants in its "ACE Blue" supervisor training program. (Exh. H; Second Am. Compl., ¶ 25; Exh. F at 55; Exh. G at 138-39)

37.     Participants who did not complete the program in good standing would not be eligible for rehire by ACG or receive the $2,000 bonus. (Exh. L; Exh. D at 120, 160, 172-73)

38.     Instead, the bonus would be retained by ACG to cover the cost of the participant's travel to and from India. (Exh. L)

39.     ACG purchased a round-trip ticket for Plaintiff at the outset. (Exh. M)

40.     Because the airline did not permit booking travel far enough in advance, ACG purchased the latest then-available return ticket for Plaintiff, with the understanding that ACG would simply change her return flight later to correspond with her actual return date. (Exh. A, ¶ 7)

41.     Participants such as Plaintiff who did complete the program in good standing received the $2,000 savings payment. (Exh. G at 272)

42.     ACG management created and distributed a very basic flyer, which was based on materials and information provided by Aegis Aspire, to local HR managers at ACG call centers around the United States, including the Joplin call center where Plaintiff worked, to introduce the program to ACG employees. (Exh. C at 21; Exh. F at 17-18, 48; Exh. D at 23-24, 28-29, 144-45; Exh. O, Flyer; Exh. A, ¶ 6)

43.     The flyer does not:

  a.   promise that participants would receive a calling card;

5

> b. promise that participants would reside in a college dormitory;
>
> c. promise that the participants would work part-time hours;
>
> d. promise that the courses would be taught by live instructors;
>
> e. promise participants three meals per day; or
>
> f. promise participants placement in the ACE program upon their return to the United States. (Exh. O; Exh. A, ¶ 6; Exh. G at 20-24)

44. The flyer does:

> a. promise participants a $100 monthly allowance; and
>
> b. promise participants that they would have health insurance provided at no cost to them—though it does not describe the services covered or other specifics such as deductibles, co-insurance, or out-of-pocket maximums. (Exh. O; Exh. A, ¶ 6)

45. Plaintiff saw the flyer posted on a cork board in the Joplin call center. (Exh. G at 17, 27)

46. Plaintiff initially applied for the program but was not interviewed. (Exh. G at 30-32)

47. About two months later, Plaintiff found out there was still an opportunity to participate in the Cross-Shoring program when an ACG human resources representative, Drew Balentine, approached her to gauge her interest. (Exh. G at 32-34)

48. Plaintiff told Balentine that she was still interested in going. (Exh. G at 34)

49. Plaintiff then had a short phone call with Niti Prothi, ACG recruiter for the program, during which Plaintiff was able to ask questions. (Exh. G at 34, 36-37, 43-45, 49-51)

50. Plaintiff and Ms. Prothi discussed the program details, and Ms. Prothi confirmed that Plaintiff was accepted. (Exh. G at 51)

51.     Plaintiff decided to participate in the Cross-Shoring Program at the time of this conversation, at a time when Plaintiff knew little about the program other than what was on the flyer. (Exh. G at 34, 36-37, 43-45, 49-51, 68)

52.     During the interview, Plaintiff and Ms. Prothi discussed that Plaintiff was unmarried, did not have children, and wanted to "meet some of God's other children." (Exh. G at 44, 45)

53.     They also discussed the typical dress code of Indian women and the fact that many Indians spoke English. (Exh. G at 45, 46, 50)

54.     When Prothi asked whether Plaintiff would be able to work for several hours and immediately attend class thereafter, Plaintiff said she could. (Exh. G at 49)

55.     At the conclusion of the interview, Ms. Prothi told Plaintiff she was accepted and that she should ask human resources to assist her in obtaining a passport. (Exh. G at 51)

56.     Plaintiff received the "Exchange Student Handbook" that was prepared by Aegis Aspire after she had already agreed to participate in the program. (Exh. G at 69)

57.     Plaintiff never did anything more than skim the handbook. (Exh. G at 78)

58.     In fact, Plaintiff believed she was going to Mumbai, not Coimbatore. (Exh. G at 79)

59.     Plaintiff was never shown a PowerPoint presentation before leaving for India, and never saw pictures of either Aegis Global Academy or the living facilities prior to leaving for India. (Exh. G at 86-87)

60.     Before leaving for India, Plaintiff traveled to Dallas, Texas, for one day to meet up with other participants so that they could leave the United States as a group. (Exh. G at 89-90, 94-95)

61.     While in Dallas, Plaintiff had a roughly one hour meeting with Shrinivas Shetty, during which time Plaintiff was permitted to ask additional questions. (Exh. G at 94-95, 100-01, 104-06, 109)

62.     ACG staff provided information to participants about what would happen in India based on information that had been provided to them by Aegis Aspire. (Exh. G at 94-95, 100-01, 104-06, 109)

63.     Plaintiff signed a Leave of Absence Agreement (the "Agreement") on August 11, 2011. (Exh. H; Exh. G at 132-33)

64.     The Agreement provided that if Plaintiff successfully completed the program, she could return to her position in Joplin and would be placed in the ACE supervisor training program. (Exh. H)

65.     The Agreement imposed no other obligations on ACG or Aegis USA (other than those legal duties inherent in every contract, such as the duty of good faith and fair dealing). (Exh. H)

66.     Upon arriving at Aegis Global Academy in India, Plaintiff attended an orientation, where she first learned many of the details about the program. (Exh. G at 143-46; Exh. D at 28-29)

67.     Approximately one month before leaving for India, Plaintiff received roughly $7,000 from the Federal Emergency Management Agency. (Exh. G at 60)

68.     When Plaintiff arrived in India, she had approximately $4,000 in cash. (Exh. G at 60-61)

69.     While in India, Plaintiff received an additional approximately $1,900 in gifts from ACG and other ACG employees in the United States. (Exh. G at 63)

70.     Plaintiff also received additional monetary gifts from her grandmother and boyfriend. (Exh. G at 65-66)

71.     According to Plaintiff, it would have cost her approximately $1,900 to purchase a plane ticket to return home. (Exh. G at 197)

72.     When Plaintiff left India, she still had approximately $3,000 cash. (Exh. G at 197-98)

73.     In addition, Plaintiff received the $100 per month stipend. (Exh. G at 223)

74.     Aegis Aspire converted the $100 stipend into Rupees and paid a flat rate of 4,500 Rupees, but when participants complained about the exchange rate, Aegis Aspire made an additional payment to adjust for the exchange rate, and then increased Plaintiff's total compensation. (Exh. G at 223, 225-27; Exh. N; Exh. P, Friend Dep. Ex. 11; Exh. D at 119-20)

75.     Participants who were previously paid $100 for 146.85 or fewer hours of work per month would thereafter receive $100 for the same hours, but with an opportunity to earn up to $150 if they worked more hours pursuant to the incentive. (Exh. G at 225-27; Exh. P; Exh. N)

76.     Plaintiff spent at least $50 per month on cigarettes. (Exh. G at 163-64)

77.     Plaintiff spent approximately $80 per month on alcohol. (Exh. G at 165-66)

78.     Plaintiff spent at least $24 per month on restaurant food. (Exh. G at 157-58, 254-55; Exh. K, Friend Dep. Ex. 8)

79.     Plaintiff spent an additional monthly sum on Coca-Cola, which she consumed every day. (Exh. G at 167; Exh. K)

80.     Plaintiff also traveled recreationally while in India, including trips to Mount Kerala, waterfalls, and an amusement park. (Exh. G at 208, 210-13, 218; Exh. Q, Friend Dep. Ex. 9; Exh. R, Friend Dep. Ex. 10)

81.     Plaintiff's supervisor in India was Shaun Chettiar and Chettiar's boss was Stephen Krishna. (Exh. G at 134, 173, 269; Exh. D at 40)

82.     None of these individuals was employed by either Aegis USA or ACG. (Exh. B at 12-13, 24-25, 28-29; Exh. G at 193-94, 269)

83.     ACG management in the United States did not control Plaintiff's work in India. (Exh. G at 193-94; Exh. B at 29; Exh. C at 79-80; Exh. F at 71; Exh. D at 34-35, 97)

84.     Although she may have had other complaints, Plaintiff's principal complaints about the Cross-Shoring Program were the pay, which she thought was insufficient, and the food, which she did not like. (Exh. D at 106, 112)

85.     Plaintiff voiced those complaints to Debra Zismer, the HR manager at ACG's Joplin call center. (Exh. G at 194-95; Second Am. Compl., ¶¶ 74-75; Exh. F at 28-29)

86.     ACG had no control over Aegis Aspire and could not directly resolve Plaintiff's complaints. (Exh. G at 195; Exh. B at 12-13, 24-25, 28-29; Exh. C at 79-80; Exh. F at 71; Exh. D at 148-49; Second Am. Compl., ¶ 77)

87.     However, Zismer took Plaintiff's complaints seriously and escalated them to ACG's Vice President of Human Resources, Mary Mullen, and Shrinivas Shetty, ACG's liaison for the Cross-Shoring Program, both of whom were in Texas. (Exh. F at 41-43)

88.     Shetty then communicated Plaintiff's complaints to Shaun Chettiar, Plaintiff's supervisor in India, to be directly resolved by Aegis Aspire. (Exh. D at 117-19, 125, 127, 129-30, 145, 148-49, 152-53, 156, 160)

89.     Plaintiff also voiced her complaints to Aegis Aspire. (Second Am. Compl., ¶¶ 71-73; Exh. G at 193, 196)

90.     When the ACG employees received no further complaints from Plaintiff, they assumed the purported problems had been resolved. (Exh. D at 118-19)

91.     At some point, Plaintiff decided she was not going to perform any work in the call center and simply declined to show up to work. (Exh. G at 222-23)

92.     Plaintiff took time off of work when she was ill. (Exh. G at 224)

93.     Plaintiff was provided with health insurance that paid half of the expenses from her stay at a hospital. (Exh. G at 249, 250)

94.     Plaintiff suffered no adverse consequences when she did not work. (Exh. G at 223)

95.     Plaintiff was accepted into the ACE program in August 2012 and began the ACE Blue training several months later. (Second Am. Compl. ¶¶ 97, 104(h); Exh. G at 237-38, 274; Exh. C at 72)

## ARGUMENT

Based on the foregoing facts, which are hereby incorporated by reference, Defendants are entitled to judgment as a matter of law on each of Plaintiff's claims.

## I.     Defendants are Entitled to Judgment as a Matter of Law on Plaintiff's Misrepresentation Claims (Counts I and II)

Counts I and II are claims for fraudulent and negligent misrepresentation based on eight statements. It is undisputed, however, that each of the eight statements was (1) a prediction or promise of something to be done by an independent third-party, and (2) a representation of a future event made without knowledge of its actual falsity. The record further establishes that six of the statements were made after Plaintiff had already volunteered to participate in the Cross-Shoring Program and the other two statements were substantially true. As set forth herein, these

facts entitle Defendants to judgment as a matter of law on both of Plaintiff's misrepresentation claims.

### A.  Statements regarding the future conduct of third parties are not actionable

To prevail on her misrepresentation claims, Plaintiff must show that Defendants made a misrepresentation concerning <u>a past or existing fact</u>. *Sindecuse v. Katsaros*, 541 F.3d 801, 803 (8th Cir. 2008). "One cannot predicate a fraud action upon a statement regarding what independent third parties will do in the future." *Id.*  Missouri law is clear that this rule applies to both fraudulent and negligent misrepresentation claims: "Statements, representations, or predictions about an independent third party's future acts simply do not constitute actionable misrepresentation."  *Massie v. Colvin*, 373 S.W.3d 469, 472 (Mo. App. 2012) (affirming summary judgment dismissing plaintiff's fraudulent and negligent misrepresentation claims). *See also Ryann Spencer Grp., Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284, 291 (Mo. App. 2008); *Bohac v. Walsh*, 223 S.W.3d 858, 863 (Mo. App. 2007); *Eureka Pipe, Inc. v. Cretcher–Lynch & Co.*, 754 S.W.2d 897, 898–99 (Mo. App. 1988).

The eight alleged misrepresentations are set forth in Count I of Plaintiff's Second Amended Complaint:

> Upon information and belief, Aegis USA and ACG together made the following representations to Plaintiff, Aegis USA provided the written materials and documents, including power point (sic) presentations, fliers (sic), and memoranda to ACG employees.  The verbal representations were made to Plaintiff by employees of ACG, Aegis USA, or both.
>
> Defendants, as described above, made the following representations to Plaintiff:
>
> a.      She was told she would receive a stipend (sic) 100 dollars on the first of every month;
>
> b.      She was told she would receive a calling card worth 500 rupees on the first of every month;

       c.      She was told she would be living on a college campus in a
dormitory;

       d.      She was told that while in India she would be working part-
time hours;

       e.      She was told she would regularly attend classes with live
instructors;

       f.      She was told she would receive three meals per day;

       g.      She was told she would be provided with healthcare
coverage by Aegis; and

       h.      She was told she would be placed in the "ACE" program
upon her return to Joplin.

Doc. No. 34, Second Am. Compl. ¶¶ 102-03. They are also incorporated by reference in

Count II. *Id.* ¶ 119.

      Plaintiff was provided and signed the Leave of Absence Agreement on August 11, 2011,

which granted her leave from her position with ACG in Joplin, Missouri, for one year so that she

could pursue a study program at Aegis Global Academy. Statement of Uncontroverted Material

Facts ("SUMF") ¶¶ 17, 23, 63.  The only "representation" in that document—actually a

promise—that concerned the future conduct of ACG[1] was that Plaintiff could return to her

position and be placed in the ACE supervisor training program upon her successful completion

of the program. SUMF ¶¶ 64, 65. It is undisputed that Plaintiff was accepted into the ACE Blue

program in August 2012 and began the ACE Blue training several months later. SUMF ¶ 95.

      All of the other "representations"—actually promises—complained of by Plaintiff

concerned actions to be taken by Aegis Aspire, the owner and operator of Aegis Global

Academy. SUMF ¶¶ 20, 23, 25-34. Aegis Aspire is independent of, and not subject to control by,

---

[1] Until January 1, 2014, ACG was a subsidiary of Aegis USA. SUMF ¶ 3. Aegis USA actually
made no representations to Plaintiff.

ACG or Aegis USA.[2] SUMF ¶ 10. It is settled law that statements concerning future conduct of independent third parties are not actionable. *Sindecuse, Massie, and Ryann Spencer, supra.* This Court should grant summary judgment on Counts I and II on this basis alone.

**B.  Misrepresentation claims based on promises of future conduct are only actionable if the speaker had actual knowledge that his statements were false**

Even if the statements about the Cross-Shoring Program concerned the future conduct of ACG or Aegis USA—as opposed to Aegis Aspire—Plaintiff's misrepresentation claims would still fail as a matter of law. Specifically, Count I should be dismissed for the lack of any evidence showing that ACG or Aegis USA knew that the statements were false at the time they were made, and Count II should be dismissed because a negligent misrepresentation claim cannot arise from an expression of the speaker's future intent.

1.  <u>Count I – Fraudulent Misrepresentation Claim</u>.  An unkept promise does not constitute actionable fraud unless it is accompanied by a <u>present intent not to perform</u>. *Trotter's Corp. v. Ringleader Rests.*, 929 S.W.2d 935, 940 (Mo. App. 1996) (emphasis added).  This intent cannot be established by mere nonperformance. *Thoroughbred Ford, Inc. v. Ford Motor Co.*, 908 S.W.2d 719, 732 (Mo. App. 1995).  Rather, Plaintiff has the burden to prove that Defendants never intended performance. *Grossoehme v. Cordell*, 904 S.W.2d 392, 396-97 (Mo. App. 1995). For this reason, when a plaintiff claims that a defendant misrepresented a future event—as opposed to an existing fact—the law imposes a heightened *scienter* requirement.  *Stevens v. Markirk Const., Inc.*, 2014 WL 211466 (Mo. App. Jan. 21, 2014). The required *scienter* for a misrepresentation of a future event is that the speaker <u>knew that her or her representation was false</u> at the time it was made. *Id.*

The record simply does not support Plaintiff's allegation that ACG or Aegis USA

---

[2] Aegis Aspire is not a party to this lawsuit, and Plaintiff has never sought to add it as a party.

knowingly made false statements about the Cross-Shoring Program. To the contrary, any statement made by ACG and Aegis USA to Plaintiff was entirely based on information received from Aegis Aspire. SUMF ¶¶ 20, 21. No representative of ACG or Aegis USA conducted any independent investigation or altered the Aegis Aspire materials in any way. SUMF ¶ 22. Thus, even if any of the statements regarding the Cross-Shoring Program proved to be ultimately false, neither ACG nor Aegis USA knew that they were false at the time the representations were made.

Simply put, Plaintiff cannot meet her burden. To prevail on her fraud claim, Plaintiff must convince the jury to find that representatives of ACG or Aegis USA knew their statements about the Cross-Shoring program were false when they were made. MAI 23.05 (notes on use); *Stevens, supra*. No reasonable juror could make such a finding based on the evidentiary record. This Court should dismiss Plaintiff's fraudulent misrepresentation claim on summary judgment.

2.  Count II – Negligent Misrepresentation Claim. The fact that each of the alleged misrepresentations is a promise of future conduct is also fatal to Plaintiff's negligent misrepresentation claim. This is because broken promises of future conduct, if they are representations at all, may only be redressed by a claim for fraud, and as previously indicated, Plaintiff's claim for fraudulent misrepresentation must fail. *See Comp & Soft, Inc. v. AT&T Corp.*, 252 S.W.3d 189, 197 (Mo. App. 2008) ("[I]t is impossible to be negligent in failing to ascertain the truth or falsity of one's own future intentions."); *Hoag v. McBride & Son Inv. Co., Inc.*, 967 S.W.2d 157, 174 (Mo. App. 1998) ("[A] negligent misrepresentation claim cannot arise from a statement regarding the speaker's future intent."). As such, this Court should dismiss Plaintiff's Count II negligent misrepresentation claim on summary judgment.

**C.  Plaintiff did not rely on six of the alleged misrepresentations**

An essential element of both fraudulent and negligent misrepresentation is reliance; the

plaintiff must actually rely on the defendant's statement. *See Coverdell v. Countrywide Home Loans, Inc.*, 375 S.W.3d 874, 884-85 (Mo. App. 2012). If the plaintiff acts or changes position prior to a communication, she cannot establish reliance and her misrepresentation claims fail as a matter of law. *Id.* at 885.

Plaintiff applied to participate in the Cross-Shoring Program after only viewing a basic flyer. SUMF ¶¶ 42, 45-47. The only alleged misrepresentations that appear on the flyer that Plaintiff saw before deciding to apply for the program concern the $100 monthly stipend and health insurance.[3] SUMF ¶ 44. As set forth below, the record shows that the flyer's promises were substantially fulfilled. Plaintiff cannot dispute, however, that the flyer simply does not make the other six representations that form the basis of Counts I and II. SUMF ¶ 43.

The flyer does not state that participants would receive a calling card. SUMF ¶ 43(a). It does not state that participants would reside in a college dormitory. SUMF ¶ 43(b). It does not state that the participants would work part-time hours. SUMF ¶ 43(c). It does not state that the courses would be taught by live instructors. SUMF ¶ 43(d). It does not promise participants three meals per day. SUMF ¶ 43(e). It does not state that participants would be placed in the ACE program upon their return to the United States. SUMF ¶ 43(f). It is therefore undisputed that Plaintiff heard the statements set forth in subparagraphs 103(b, c, d, e, f, and h)—if at all—***after*** she applied to participate in the Cross-Shoring Program.

The only other information Plaintiff received prior to deciding to go India was during her interview with Niti Prothi. SUMF ¶ 49. During this conversation, Plaintiff reiterated her interest in the program. SUMF ¶¶ 50, 51. Plaintiff explained that she was unmarried and did not have children and wanted to "meet some of God's other children." SUMF ¶ 52. They also discussed

---

[3] These are representations (a) and (g) in Paragraph 103 of Plaintiff's Second Amended Complaint.

the typical dress code of Indian women and the fact that many Indians spoke English. SUMF ¶ 53. Plaintiff responded affirmatively when asked if she would be able to work for several hours and attend classes immediately thereafter. SUMF ¶ 54. At the conclusion of the interview, Ms. Prothi told Plaintiff she was accepted and that she should ask human resources to assist her in obtaining a passport. SUMF ¶ 55.

The law is clear that only statements made **_prior to_** a plaintiff's alleged detrimental reliance can give rise to a claim for misrepresentation. *Coverdell, supra.* The record shows that Plaintiff's decision was made during her interview with Ms. Prothi. SUMF ¶¶ 48-51. Up to this point, there were simply no representations made about calling cards, dormitory living, part-time work schedules, live course instructors, the number of meals to be provided each day, or the ACE program. SUMF ¶¶ 43, 45-55. These undisputed facts provide an additional and independent basis upon which Defendants are entitled to summary judgment as to Plaintiff's fraudulent and negligent misrepresentation claims arising from these six statements.

> **D.    The two representations upon which Plaintiff could have relied were substantially true**

Another essential element of both fraudulent and negligent misrepresentation claims is that the statements upon which the plaintiff relies are false at the time that they are made. *See Velder v. Cornerstone Nat. Ins. Co.*, 243 S.W.3d 512, 517 (Mo. App. 2008). "The truth or falsity of the representation is determined <u>as of the time it was made and as of the time it was intended to be relied and acted upon</u>." *Id.* (emphasis added). The record simply does not support Plaintiff's claim that the representations set forth in subparagraphs 103(b) and (g), as stated on the flyer, were false.

### 1. $100 stipend [¶ 103(b)]

Plaintiff's allegation that the promise of a $100 monthly stipend or allowance was a misrepresentation focuses on the decision of Aegis Aspire to convert the sum from U.S. Dollars to Indian Rupees. Although Aegis Aspire initially paid participants slightly less than $100 due to fluctuating exchange rates, it is undisputed that Aegis Aspire made additional payments to adjust for the exchange rate, and later increased the stipend outright. SUMF ¶ 74.

Given these undisputed facts, the flyer's statement regarding a $100 allowance was not false when made. Aegis Aspire did attempt to pay participants the local equivalent of $100, and when it realized that participants were receiving less due to currency exchange issues, it made a compensating adjustment. Indeed, the evidence contradicts (rather than supports) Plaintiff's allegation that the flyer's promise regarding the allowance was false, let alone that it was intended to be false.

### 2. Health insurance [¶ 103(g)]

Plaintiff's allegation that the promise of health insurance was a misrepresentation turns on the fact that she had to pay part of her hospital bill and for all of her cosmetic dental work. Second Am. Compl. ¶¶ 103(g), 104(g). The law is clear that the truth of a statement is determined at the time of the promise and Plaintiff's alleged reliance thereupon. *Velder, supra.* The flyer promised only that participants would receive health insurance; it did not describe the services covered or other specifics such as deductibles, co-insurance, or out-of-pocket maximums. SUMF ¶ 44(b). Plaintiff freely admits that she was provided with health insurance that paid half of the expenses from her hospitalization. SUMF ¶ 93. The fact that the health insurance did not fully pay for her hospitalization or provide coverage for dental procedures does not make the flyer's statement about health insurance an actionable misrepresentation.

18

Based on the foregoing, Defendants are entitled to summary judgment on Plaintiff's fraudulent and negligent misrepresentation claims.

## II. Summary Judgment is Warranted on Plaintiff's Combined Forced Labor and Benefitting from Forced Labor Claim (Count III)

Count III is a claim against Defendants under The Trafficking Victims Protection Act ("TVPA") for both "forced labor" under Section 1589(a)(4) and benefitting from forced labor under Section 1589(b). Plaintiff's allegations of "forced labor" not only reflect an impermissibly expansive application of an important federal statute, but strain the factual allegations beyond credulity to do so. Simply put, Plaintiff's complaints do not meet the elements of any cause of action under the TVPA.

The TVPA criminalizes certain acts[4] in order "to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions." *Nunag-Tanedo v. East Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134, 1143 (C.D. Cal. 2011) (citing H.R. Conf. Rep. 106-939, at 1 (2000)). "The purpose of the act is to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children," many of whom "are trafficked into the international sex trade, often by force, fraud, or coercion." *Id.* This Court should grant summary judgment on Count III for the following reasons.

### A. The Trafficking Victims Protection Act Does Not Cover Plaintiff's Claims

As a threshold matter, Plaintiff's claim is that she, as an American, was "trafficked" from the United States to India for purposes of "forced labor" in India. There is no authority for the proposition that the TVPA covers such a claim. The United States Supreme Court has expressly affirmed the "presumption against extraterritorial application" as a Constitutional limitation on

---

[4] As a criminal statute, the TVPA is to be construed narrowly, not broadly. *See, e.g.*, *King v. U.S.*, 595 F.3d 844, 852 (8th Cir. 2010) ("our deeply rooted tradition in the realm of criminal law is to apply the law strictly as written.")

the authority of both state and federal governments. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013). This canon "reflects the presumption that United States law governs domestically but does not rule the world." *Id.* (citing *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). "Nor, as a general rule, does a State have a legitimate concern in [punishing] a defendant for unlawful acts committed outside of the State's jurisdiction." *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003).

This presumption applies to the TVPA, the focus of which "is the trafficking of people into the United States, including for the purpose of compelling forced labor here." *Tanedo v. East Baton Rouge Parish School Board*, No. SA CV10-01172 JAK, 2012 WL 5378742, *6 (C.D. Cal. Aug. 27, 2012). "The object of the statute's solicitude—what it regulates and protects—is those forced to labor within the United States." *Id.* Although Congress amended the TVPA in 2008 to address certain extraterritorial conduct, "the focus and touchstone of the territoriality inquiry of the TVPA is where the forced labor occurred and to where the victims were trafficked, and not from where the victims were trafficked or whether some of the means used to compel the labor occurred abroad." *Id.*

The limited extraterritorial application of the TVPA authorized by Congress is to cover those acts occurring abroad that ultimately result in trafficking of victims into the United States. On the other hand "the TVPA is not applied extraterritorially when it addresses trafficking people *into* the United States to perform forced labor here, even if done by means of threats of serious harm in part made elsewhere." *Id.* (emphasis in original).[5] Thus, summary judgment on Plaintiff's TVPA claim is appropriate for this reason alone.

---

[5] For this reason, "TVPA cases regularly address trafficking into the United States," but by contrast, "application of the TVPA to laborers who worked entirely in Liberia, even for an American employer, was deemed an extraterritorial application of the TVPA," and "the TVPA

**B.      Defendants Are Not the Proper Party**

Further, like so many of Plaintiff's other claims, Count III seeks to hold ACG and Aegis USA responsible for alleged "forced labor" that was obtained, if at all, by a non-party, Aegis Aspire. Plaintiff worked for Aegis Aspire, and not ACG or Aegis USA, during the period in which she allegedly endured "forced labor."  SUMF ¶¶ 12, 63, 81-83, 86. Thus, if Plaintiff's labor was in fact obtained by any of the means prohibited by Section 1589(a), it was obtained by Aegis Aspire. Section 1589(a) simply does not contemplate an action against a party for which the plaintiff does not perform the allegedly forced labor.[6] Summary judgment on Count III is appropriate for this additional reason.

**C.      Plaintiff Cannot Establish a Fear of "Serious Harm"**

Even assuming, *arguendo*, that the TVPA has extraterritorial reach, Plaintiff cannot establish that she was threatened with serious harm (by any entity). The TVPA defines "serious harm" as:

> "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to

---

does not apply to trafficking of persons to work in Iraq." *Id.* (comparing *U.S. v. Dann*, 652 F.3d 1160 (9th Cir. 2011) (trafficked from Peru to the United States); *U.S. v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) (trafficked from the Philippines to the United States); *U.S. v. Bradley*, 390 F.3d 145 (1st Cir. 2004), *vacated on other grounds,* 545 U.S. 1101 (2005) (trafficked from Jamaica to the United States); with *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988 (S.D. Ind. 2007) (work performed entirely in Liberia); and *Nattah v. Bush*, 541 F. Supp. 2d 223 (D. D.C. 2008), *aff'd in part, rev'd on other grounds,* 605 F.3d 1052 (D.C. Cir. 2010) (work performed entirely in Iraq).
[6] Presumably, this is why Plaintiff included in Count III a claim based on subsection (b) of the statute, which prohibits "benefitting from forced labor."

perform or to continue performing labor or services in order to avoid incurring that

harm."

18 U.S.C. § 1589(c)(2).

In other words, to prevail on this claim Plaintiff must prove that ACG and Aegis USA

intended to cause Plaintiff to believe that if she did not continue to work, she would suffer the

type of serious harm that would compel someone in her circumstances to continue working to

avoid that harm. *U.S. v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011). "Congress intended to

address serious trafficking, or cases where traffickers threaten harm to third persons, restrain

their victims without physical violence or injury, or threaten dire consequences by means other

than over violence." *Id*. It bears repeating that because this statute creates a civil remedy for a

criminal statute, the type of "serious harm" required is that which is sufficient to amount to

criminal behavior.

The alleged "serious harm" upon which Plaintiff relies is that she was told that if she

stopped providing labor in India "she would [1] lose her job in Joplin, Missouri, and [2] be

responsible for all costs associated with her trip to India."[7] Second Am. Compl. ¶ 140. Even if

true, these do not amount to "serious harm" as a matter of law. A line is drawn between improper

threats or coercion and permissible warnings of adverse but legitimate consequences. *Headley v.*

*Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (citing *U.S. v. Bradley*, 390

F.3d 145, 151 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005)). The "threats"

about which Plaintiff complains are of the latter variety. An apropos example is given in *Nunag-*

*Tanedo v. East Baton Rouge Parish School Board*:

---

[7] The prospect of unemployment can hardly be sufficient to prove "serious harm. If it were,
virtually every single employment relationship in the United States would be considered
"forced" because the natural result of quitting any job is unemployment.

> "After the worker joins the program and begins employment, the worker becomes unhappy. But if the worker quits, awaiting is a trip home with a massive amount of debt that will be impossible to repay. Working in the program is the only way to repay the loan. <u>Is this forced labor? Fraud? No. it is a bargained-for exchange.</u> Despite the worker's unhappiness, the terms and costs of the program were known, and the worker voluntarily obtained the loan to join the program. The worker's eventual discontent does not transform the valid contract with the [defendants] into something illegal."

790 F. Supp. 2d 1134, 1143 (C.D. Cal. 2011).

While Plaintiff seeks to avoid the necessarily narrow reading of this criminal statute by referencing that "[a] reasonable person of the same background and in the same circumstances as Plaintiff would have felt compelled to perform or continue performing labor or services" to avoid the two types of harm identified by Plaintiff, even that allegation is illusory. Second Am. Compl. ¶ 143. <u>Plaintiff admits that at some point she voluntarily stopped working in India, and also missed work when she was sick, yet she suffered no adverse consequences whatsoever.</u> SUMF ¶¶ 91-92, 94. This undisputed fact alone completely belies Plaintiff's claim, as she clearly did not fear she would suffer serious harm if she stopped working, because in fact she voluntarily stopped working.[8]

Moreover, Plaintiff had approximately $4,000 in cash when she left for India.[9] SUMF ¶ 68. In addition, Plaintiff received approximately $1,900 in gifts from ACG and other ACG employees nationwide while she was in India to assist Plaintiff in recovering from the Joplin tornado, as well as additional sums from her grandmother and boyfriend. SUMF ¶¶ 69-70. However, Plaintiff did not use any of that money to return home (which, according to Plaintiff, would have cost $1,900, the same amount of money she received in gifts from ACG and other

---

[8] Moreover, this fact bolsters Defendants' argument that this is not a forced labor case, because Plaintiff was clearly free to cease performing work without any adverse consequences.
[9] Plaintiff received roughly $7,000 from the Federal Emergency Management Agency approximately one month before leaving for India.

ACG employees) and support herself while she searched for a new job; rather, she spent half of it on cigarettes, alcohol, restaurant food, and travel, and simply kept the other half.[10] SUMF ¶¶ 71-72; Exh. G at 176-78, 229-35. Indeed, while in India Plaintiff spent at least $50 per month on cigarettes, approximately $80 each month on alcohol, at least $24 per month on restaurant food, and an additional monthly sum on Coca-Cola, which she consumed every day. SUMF ¶¶ 76-79. Plaintiff also traveled recreationally while in India at her own expense. SUMF ¶ 80.

Considering all these circumstances, the Court may conclude as a matter of law that a reasonable person in similar circumstances who had the financial resources to return home, but instead chose to take vacations, dine out frequently, and spend substantial sums on cigarettes and alcohol, who voluntarily quit working with no adverse consequences, and who had the option to leave at no cost but chose to stay voluntarily, would not have felt "compelled" to continue performing labor and should grant summary judgment on Count III.

D.    **Plaintiff Cannot Establish the Requisite *Scienter***

Even if the conduct alleged could meet the high threshold of what is considered "serious harm," these claims fail for failure to meet the statutory *scienter* requirement. To prevail on her Section 1589(a)(4) claim, Plaintiff must establish that ACG and Aegis USA <u>knowingly</u> obtained forced labor "by means of any scheme, plan, or pattern <u>intended</u> to cause [Plaintiff] to believe" that if she did not perform labor she would suffer serious harm. 18 U.S.C. § 1589(a)(4) (emphasis added). "Section 1589 contains an express *scienter* requirement." *U.S. v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008). Further, the "scheme, plan, or pattern" method of obtaining forced labor "contains a second *scienter* requirement: by means of any scheme . . . intended to cause the person to believe . . . ." *Id.* (internal citation omitted).

---

[10] Plaintiff still had $3,000 when she returned to the United States. SUMF ¶ 72.

"Obtaining the services of another person is not itself illegal; it is illegal only when accompanied by one of the [four] given circumstances, and the jury must find that the defendant knew that the circumstances existed." *Id.* (emphasis added). When a scheme or pattern is alleged, "the statute requires that the plan be intended to cause the victim to believe" that she will suffer harm. *Dann*, 652 F.3d at 1170. "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall [her]." *Id.* (emphasis added).

There is no genuine issue of material fact as to either *scienter* requirement. Plaintiff has no evidence that either ACG or Aegis USA knowingly obtained forced labor by means of a scheme that either ACG or Aegis USA intended to cause her to believe she would suffer the harm she now alleges, to wit: that she would lose her job in Joplin and would have to bear the expense of her own plane fare back home. The evidence is to the contrary. In fact, the uncontroverted evidence is that ACG told Plaintiff from the beginning that it would pay for her return trip. SUMF ¶ 24, 39-40, 56; Exh. H. ACG purchased a round-trip ticket for Plaintiff at the outset, indicative of its intent to provide Plaintiff with a way back home at the end of the program. SUMF ¶¶ 39-40. When Plaintiff complained to ACG employees in the United States about her living accommodations, food and expenses in India, those employees tried to help resolve those complaints (despite not having the power to do so). SUMF ¶¶ 84-90. There is simply no basis upon which Plaintiff can maintain that either ACG or Aegis USA knew the Cross-Shoring Program was actually a scheme to obtain forced labor by intentionally causing Plaintiff to believe she would suffer the type of serious harm she alleges if she did not work.[11]

---

[11] *Compare, e.g.*, *U.S. v. Sabhnani*, 599 F.3d 215, 241-44 (2nd Cir. 2010) (sufficient evidence that defendant knew he was participating in, and benefitting from, forced labor, where plaintiffs

### E. Plaintiff Cannot Establish that Defendants Knowingly Benefitted from Forced Labor

Summary judgment on Plaintiff's claim in Count III against both Aegis USA and ACG for "benefitting from forced labor" is also warranted. To prevail on a Section 1589(b) claim, Plaintiff must establish that ACG and Aegis USA <u>knowingly</u> benefitted from participation in a venture that ACG and Aegis USA either <u>knew or recklessly disregarded</u> was engaged in forced labor. 18 U.S.C. § 1589(b). First and foremost, as indicated above, there was no actionable misconduct to support a claim of "forced labor." It is uncontroverted that ACG employees in the United States took Plaintiff's complaints seriously, escalated them, and attempted to assist Plaintiff. SUMF ¶ 87. Importantly, neither ACG nor Aegis USA had any control over the circumstances about which Plaintiff complained, as each and every issue was entirely controlled by Aegis Aspire. SUMF ¶ 86. ACG and Aegis USA did what was within their power to respond to Plaintiff's complaints. SUMF ¶¶ 86-88. When the complaints ended, ACG and Aegis USA assumed the issues had been resolved. SUMF ¶ 90.

Importantly, there is no evidence that Plaintiff ever complained that she was being "forced to work" against her will, that she wanted to leave but felt she could not do so, or anything that would reasonably have alerted ACG employees that Plaintiff was the victim of "forced labor." ACG and Aegis USA simply had no reason to believe that the Cross-Shoring Program was engaging in forced labor. Moreover, there is no evidence that either ACG or Aegis USA benefitted financially or received anything of value from the cross-shoring program. SUMF ¶ 14. To the contrary, the program represented a cost, not a profit. SUMF ¶ 15. Because no benefit was derived from the Cross-Shoring Program by either entity, the Court may end its analysis of Plaintiff's Section 1589(b) claims here.

---

lived in defendant's home, defendant witnessed his wife humiliate plaintiffs, witnessed plaintiffs eat from the trash and wear rags, observed marks from beatings, etc.) *with* this case.

Summary judgment on Count III is appropriate. In addition to insurmountable legal obstacles to Plaintiff's claims, Plaintiff cannot establish the requisite elements of either of these claims. When comparing Plaintiff's circumstances to the very serious circumstances where other courts have found plausible or actual forced labor, the conclusion that Plaintiff is not a victim of forced labor is unavoidable. *See, e.g., U.S. v. Sabhnani*, 599 F.3d 215, 224-30 (2nd Cir. 2010); *U.S. v. Calimlim*, 538 F.3d 706, 708-09, 712-13 (7th Cir. 2008); *U.S. v. Dann*, 652 F.3d 1160, 1163-67, 1171-73 (9th Cir. 2011); *U.S. v. Bradley*, 390 F.3d 145, 148-49 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005).

## III.    Plaintiff Cannot Establish Unjust Enrichment (Count IV)

To have a viable unjust enrichment claim, Plaintiff must demonstrate that Defendants were unjustly enriched at Plaintiff's expense.[12] *Adams v. One Park Place Investors, LLC*, 315 S.W.3d 742, 750 (Mo. App. 2010). Plaintiff cannot meet this burden. Thus, summary judgment on Plaintiff's unjust enrichment claim is proper.

### A.    Defendants Did Not Receive a Benefit

Plaintiff claims that Defendants received a benefit, or were enriched, by either Plaintiff's labor in India or her participation in the Cross-Shoring Program. Second Am. Compl. ¶¶ 150-51. First, the evidence establishes that Plaintiff did not work for Defendants in India. SUMF ¶¶ 8, 10, 18, 31, 81-83. Second, Plaintiff cannot produce evidence that Defendants received any benefit whatsoever from Plaintiff's participation in the Cross-Shoring Program. In fact, the evidence is to the contrary: Plaintiff's participation in the Cross-Shoring Program actually cost Defendants money. SUMF ¶ 15. Because Defendants did not receive any benefit from Plaintiff,

---

[12] The elements of unjust enrichment are: (1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit. *Adams v. One Park Place Investors, LLC*, 315 S.W.3d 742, 749 (Mo. App. 2010).

Plaintiff cannot establish either the first or second element of unjust enrichment, and the Court may end its analysis here.

###### B.      Plaintiff Has Failed to Prove the Amount of Any Unjustly Retained Benefit

Judgment for Defendants is also warranted as a matter of law due to Plaintiff's inability to prove the amount of any unjustly retained benefit. "This quasi-contractual theory of recovery measures not the actual amount of the enrichment, but the amount of the enrichment that, as between the two parties, would be unjust for one party to retain." *Winslow v. Nolan*, 319 S.W.3d 497, 503 (Mo. App. 2010). "Thus, a plaintiff must present evidence of the amount of the benefit conferred upon the defendant." *Id.*

"This may be accomplished by showing proof of the reasonable value of the services performed." *Miller v. Horn*, 254 S.W.3d 920, 925 (Mo. App. 2008); *see also Roebuck v. Valentine-Radford, Inc.*, 956 S.W.2d 329, 333 (Mo. App. 1997) (plaintiff has burden of proving reasonable value and must do so via expert testimony). "Reasonable value is the price customarily paid for such services at the time and locality in question." *Id.* (emphasis added). "Proof of reasonable value is not accomplished simply by reciting the bill or referring to the contract, or stating the 'standard price' that plaintiff usually would charge for such service." *Id.* "There must be evidence establishing the objective reasonableness of plaintiff's charges." *Id.* Plaintiff has utterly failed to adduce any evidence of the amount of any benefit she allegedly conferred on Defendants or of the reasonable value of her services in India.[13] Thus, Plaintiff's unjust enrichment claim fails as a matter of law.

---

[13] Plaintiff's purported reliance on the value of her services in the United States is misplaced. Second Am. Compl. ¶¶ 153, 155. Because Plaintiff's services were performed in India, the operative analysis is the reasonable value of Plaintiff's services in India, of which Plaintiff must, but cannot, produce admissible evidence. *Miller*, 254 S.W.3d at 925. Plaintiff has proposed no witness, particularly any expert witness, who might be able to testify about the value of the services in India.

**C.      Plaintiff Cannot Establish That Retention of Any Benefit Would be Unjust**

Additionally, even if Plaintiff could prove that Defendants received a benefit, which she cannot, Plaintiff still cannot establish that retention of any alleged benefit would be unjust. "The third element, unjust retention of the benefit, is considered the most significant and the most difficult of the elements." *Adams*, 315 S.W.3d at 749. "Mere receipt of benefits is not enough, absent a showing that it would be unjust for the defendant to retain the benefit." *Id.*

"In determining whether the defendant's retention of the benefit is unjust, courts should consider whether any wrongful conduct by the defendant contributed to the plaintiff's disadvantage." *Ariel Preferred Retail Group, LLC v. CWCapital Asset Management*, 883 F.Supp.2d 797, 822 (E.D. Mo. 2012). "There must be some something more than passive acquiescence, such as fault or undue advantage on the part of the defendant, for defendant's retention of the benefit to be unjust." *Id.* Indeed, "[u]njust enrichment of benefits only occurs when the benefits were conferred (a) in misreliance on a right or duty; or (b) through dutiful intervention in another's affairs; or (c) under constraint." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. 2010). In this case, Plaintiff has no evidence of any wrongful conduct by Defendants that would permit a finding that Defendants' retention of any alleged benefit is unjust. *See* Defendants' arguments with respect to Counts I through III, *supra*. Because Plaintiff's tort and forced labor claims fail, Plaintiff has failed to create a genuine issue of material fact as to the third and most important element of unjust enrichment.

**D.      A Contract Precludes A Claim for Unjust Enrichment**

Furthermore, an alternative basis for summary judgment on Plaintiff's unjust enrichment claim is Plaintiff's breach of contract claim. Plaintiff claims that she had a contract with Defendants that governed the terms of her work in India. *See* Second Am. Compl. Count V. Defendants dispute this claim. *See* Defendants' argument with respect to Count V, *infra.*

29

Nevertheless, if Plaintiff's breach of contract claim stands, her unjust enrichment claim must fall as a matter of law.

Where the rights at issue in a lawsuit are governed by express contractual terms, the "sole avenue of recovery" for a party seeking to enforce those rights "must also lie on that contract." *Burrus v. HBE Corp.*, 211 S.W.3d 613, 619 (Mo. App. 2006). Thus, it is settled law that "a plaintiff may not maintain an action in *quantum meruit* where the plaintiff's relationship with the defendant is governed by an existing contract." *Id.* (affirming summary judgment); *see also Mello v. Davis*, 182 S.W.3d 622, 623 (Mo. App. 2005) (reversal because "judgment in *quantum meruit* cannot stand because there was an express contract between the parties that completely governed liability for legal fees for indivisibly rendered legal services"); *Lowe v. Hill*, No. WD76272, 2014 WL 2054281, *2 (Mo. App. May 20, 2014) (reversal because "a plaintiff cannot recover under an equitable theory when she has entered into an express contract for the very subject matter for which she seeks to recover").[14] Similarly, where the plaintiff's rights arise from an express contract, the plaintiff's remedy lies with the contract and other restitution-based theories are barred. *See, e.g., R & R Land Dev., L.L.C. v. Am. Freightways, Inc.*, 389 S.W.3d 234, 243 (Mo. App. 2012) ("Here, there was an express contract—negotiated during the April 2 telephone calls—which governed this transaction. Thus, the doctrine of unjust enrichment does not apply") (emphasis added); *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. 2010) ("If the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract") (emphasis added); *Lowe*, 2014 WL 2054281 at *3.

---

[14] While *quantum meruit* offers a different remedy, it is based primarily on the principle of unjust enrichment. *See, e.g., Johnson Group, Inc. v. Grasso Bros., Inc.*, 939 S.W.2d 28, 30 (Mo. App. 1997).

### E. Plaintiff's Claim Is Not Actionable as Unjust Enrichment

Finally, even assuming, *arguendo*, that Plaintiff did work for Defendants in India, and that Defendants did benefit from Plaintiff's services in India, Plaintiff's unjust enrichment claim still fails. "If the person is already employed by the [defendant], the request for additional services . . . generally does not justify the inference of an offer to pay anything in addition to the compensation specified in the contract of employment." *Roebuck*, 956 S.W.2d at 332.[15] A distinction is drawn between "extra" work, for which a claim can be made, and "additional" work which does not support a claim. "Extra work is work that is not within the contemplation of the contracting parties and is not controlled by the contract." *Steinberg v. Fleischer*, 706 S.W.2d 901, 906 (Mo. App. 1986). Work is "extra" if it is independent of the contract and is not required for the contract's full performance. In such a case, there is an inference that there was an implied promise to pay for certain services as "extra" if they are so different in nature from that originally agreed upon and so plainly beyond the scope of the original contract as to warrant the inference of an implied promise to pay for them. *See Roebuck*, 956 S.W.2d at 333. By contrast, work is "additional" if it is necessarily required for the contract's performance and, if not done, results in breach of the contract. *KC Excavating and Grading, Inc. v. Crane Const. Co.*, 141 S.W.3d 401, 409 (Mo. App. 2004).

This "extra" vs. "additional" work analysis in the employment context reveals precisely why Plaintiff's unjust enrichment claim fails even if Plaintiff worked for Defendants and Defendants benefitted from her services. Plaintiff does not claim that she performed some extra

---

[15] In a claim for services performed by an employee, the employee must show that: (1) at the special insistence and request of the employer, the employee performed work in excess of his or her ordinary and required duties for the benefit of the employer; (2) that the employer accepted such work; (3) that it amounted to an amount certain; (4) that the reasonable value for the work was a price certain; and, (5) although duly demanded of the employer, the employer has failed and refused to pay for the services. *Roebuck*, 956 S.W.2d at 332. As previously stated, Plaintiff cannot prove the third and fourth element of this claim. Nor can Plaintiff prove the fifth element.

work than what was originally contemplated and was not compensated by Defendants for that work. Plaintiff's claim is either that she performed additional work, or rather, performed exactly the work contemplated but was undercompensated for the work, neither of which is actionable. Second Am. Compl. ¶¶ 154, 157. In truth, Plaintiff alleges she "performed her end of the bargain," but Defendants failed to do so. *Id.* ¶ 157. By definition this is not an unjust enrichment claim—it is a breach of contract claim.

Based on the foregoing, this Court should grant judgment as a matter of law on Plaintiff's Count IV claim for unjust enrichment.

## IV.    <u>Plaintiff's Breach of Contract Claim Fails as a Matter of Law (Count V)</u>

Defendants are entitled to judgment as a matter of law on Plaintiff's breach of contact claim. It is axiomatic that one must be a party to a contract to be liable for its breach. The fatal flaw in Plaintiff's claim is that if an implied contract existed at all, Defendants were not a party to the contract.

According to Plaintiff, the terms of the alleged implied contract where "an agreement by Plaintiff to perform labor and services . . . in exchange for adequate housing on a college campus, three meals per day, timely pay of 100 dollars per month and SIM card worth 500 rupees." Second Am. Compl. ¶ 161. Moreover, the alleged breaches of the implied contract according to Plaintiff are failure to provide adequate housing, three meals per day, timely payment or SIM card, and access to instructors.[16] *Id.* ¶ 163. The evidence establishes that each of the identified aspects of Plaintiff's work in India was controlled entirely by Aegis Aspire, not Defendants. SUMF ¶¶ 8, 10, 12, 18, 31, 81-83, 86. Thus, if an implied contract existed that

---

[16] In support of her breach of contract claim, Plaintiff also alleges that she was not placed in the ACE program. Second Am. Compl. ¶ 164. However, Plaintiff admits that she was placed in the ACE program elsewhere. Second Am. Compl. ¶¶ 97, 104(h); SUMF ¶ 95. In fact, Plaintiff was placed in the ACE program upon her return. SUMF ¶ 95.

encompassed these terms, the contract was with Aegis Aspire.[17] Defendants cannot be held liable for breach of a contract to which they were not parties, and are entitled to judgment as a matter of law.

Even if Defendants were the proper party to the alleged implied contract, the contract is unenforceable as a matter of law because it is barred by the statute of frauds. The Missouri statute of frauds states, in pertinent part, that "[n]o action shall be brought . . . upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith." R.S.Mo. § 432.010 (emphasis added). The implied oral contract asserted by Plaintiff falls squarely within the statute of frauds.

Missouri courts consistently hold that oral agreements for one year that are made in advance of commencement are barred by the statute of frauds. For example, in *Hoover v. Citizens Home Bank*, 245 S.W.2d 154 (Mo. App. 1951), the plaintiff alleged that an oral one-year employment agreement was executed on May 6, and that she did not commence work under the alleged contract until May 11. Finding the agreement unenforceable, the court held that the "statute of frauds is that no action can be maintained on a contract not in writing, which cannot be performed within one year from the time of making it." *Id*. at 156. The relevant "time commences from the making of the contract, and not from the time the performance is to commence." *Id.* (emphasis added).

Similarly, in *Waller v. Tootle-Campbell Dry Goods Co.*, 59 S.W.2d 751 (Mo. App. 1933), the court held that a one-year employment agreement allegedly made on December 26 for

---

[17] The only contract that existed between Plaintiff and Defendants was the Leave of Absence Agreement, which itself reinforces the fact that Defendants were not a party to the implied contract asserted by Plaintiff that governed her work in India. SUMF ¶¶ 63-65.

commencement on January 1 was not enforceable. The court found it "clear that if the term of existence of the employment was for a year, then performance thereof could not be performed within one year from the making thereof." *Id*. at 754. The agreement was reached "several days prior to January 1," and the statute by its very terms "operates on the contract from the time it was entered into, and not from a future date, though such may be agreed upon." *Id*. "If it is not to be performed according to its terms within one year from the date the agreement is made, it can only be proven by some memorandum or note thereof . . . in writing and signed by the party to be charged therewith." *Id. See also, e.g.*, *Campbell v. Sheraton Corp. of America*, 253 S.W.2d 106 (Mo. 1952) (one year oral employment agreement entered into on April 8 to run from April 24 to April 24 barred by statute of frauds).

By Plaintiff's own admission, the Cross-Shoring Program was to last one year. Second Am. Compl. ¶¶ 21, 49. Moreover, the Leave of Absence Agreement makes clear that Plaintiff was taking a one year leave of absence to participate in the program. SUMF ¶¶ 63-65. All of the alleged terms of the oral contract were actually aspects of the Cross-Shoring Program. Furthermore, if, as Plaintiff contends, the oral contract was with Defendants, then the alleged terms of the oral contract were agreed upon, if at all, prior to Plaintiff leaving for India and beginning the Cross-Shoring Program, and thus, before the one year period began. Plaintiff's alleged oral contract of employment in India for one year, agreed upon in advance of beginning the program, is precisely the kind of oral contract prohibited by the statute of frauds. Defendants are entitled to judgment as a matter of law on Plaintiff's Count V breach of contract claim for this additional reason.

## CONCLUSION

For all of the foregoing reasons, this Court should grant summary judgment in

Defendants' favor on Counts I-V of Plaintiff's Second Amended Complaint, and dismiss those

counts with prejudice.

ARMSTRONG TEASDALE LLP


By: _/s/ Jeremy M. Brenner_
    Robert A. Kaiser      #31410MO
    Jeremy M. Brenner    #63727MO
    7700 Forsyth Blvd., Suite 1800
    St. Louis, Missouri 63105
    314.621.5070
    314.621.5065 (facsimile)
    rkaiser@armstrongteasdale.com
    jbrenner@armstrongteasdale.com

ATTORNEYS FOR DEFENDANTS


## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2014, the foregoing was filed electronically with the Clerk of the Court and will be served by operation of the Court's electronic filing system upon the following:

Anne Schiavone
Matt O'Laughlin
HOLMAN SCHIAVONE, LLC
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112

aschiavone@hslawllc.com
molaughlin@hslawllc.com


_/s/ Jeremy M. Brenner_