IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| MANDI J. FRIEND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 3:13-cv-05054-MDH |
| ) | |
| AEGIS COMMUNICATIONS ) | |
| GROUP, LLC and AEGIS USA, INC., ) | |
| ) | |
| Defendants. ) | |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. No. 61). After careful consideration and for the following reasons, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment (Doc. No. 61).

## BACKGROUND

Plaintiff's "More Definite Second Amended Complaint For Damages" ("Complaint") (Doc. No. 34) alleges fraudulent inducement and misrepresentation in employment negotiations (Count I), negligent misrepresentation (Count II), forced labor (18 U.S.C. § 1589; 1595) (Count III), unjust enrichment (Count IV), and breach of contract (Count V) against her employers Aegis Communications Group, LLC ("ACG") and Aegis USA, Inc.[1]

Aegis USA and ACG operate call centers in various locations around the United States. Plaintiff began working for ACG in approximately 2008 as a customer service representative at its Joplin, Missouri call center. Plaintiff took a leave of absence in August 2011 from her employment to participate in a Cross-Shoring Program. Defendants contend the Cross-Shoring

---

[1] Aegis, USA and Aegis Communications Group, LLC merged effective as of December 31, 2013.

1

program was intended to be a mutually-beneficial opportunity for employees to obtain additional training and gain experience living, working and studying abroad, while also offering American clients access to American employees at a lower cost to clients. Plaintiff contends it was developed in response to the global market for outsourced customer service and intended to provide cheaper services to a client. Nonetheless, ACG permitted volunteer employees who were selected after an interview and ranking process to take a leave of absence from their jobs at ACG to participate in the program.

Aegis Aspire operated Aegis Global Academy ("Academy") in India and contracted with ACG to operate the Cross-Shoring Program.[2] Specifically, ACG entered a contract with Aegis Aspire to provide services under the Cross-Shoring Program. The "Master Support Agreement" was entered into on July 1, 2011 and stated the Company [ACG] requires Support in training and development of their employees and the Academy [Aegis Aspire] is willing and able to provide such Support. As set forth in the agreement, Support to be provided by Academy included, but was not limited to: "providing training and people development support to the employees of the Company on a residency programme basis, which would include without limitation, following: (1) class room training; (2) medical facilities; (3) practical training; (4) stipend; (5) mobile phone allowance; (6) administrative services; (7) transportation; (8) printing and stationary services; (9) any other auxiliary services."

Employees from Aegis Aspire prepared materials that described the Cross-Shoring Program and subsequently sent the materials to ACG management in Texas to be used to introduce the program to ACG employees. ACG management then created and distributed a basic flyer, based on materials and information provided by Aegis Aspire, to local HR managers

---

[2] Aegis Aspire is an Indian entity.

at call centers around the United States, including Joplin, Mo. The flyer promised participants a $100 monthly allowance and that participants would receive a $2,000 savings payment at the end of the program period. The flyer references "Aegis" several times but does not identify a specific Aegis entity.

The Cross–Shoring program was a one year program that took place in India. ACG provided transportation to and from India. Aegis Aspire provided the meals, lodging, internet access, pre-paid cellular phone, Indian-based health insurance and transportation in India. Aegis Aspire provided the $100 per month stipend to cover miscellaneous expenses and also provided the educational component to the participants through a contract it had with Cornell University. Participants who completed the program in good standing were informed they would receive a complimentary Indian vacation excursion from Aegis Aspire.

ACG informed participants they would receive a $2,000 pre-tax bonus at the end of the program period and would return to a position with ACG in the United States. Participants were also told they would be placed in the "ACE Blue" supervisor training program. Plaintiff's leave of absence agreement stated "provided that Employee has successfully completed the one year study program and has remained in good standing throughout such one year period, Employee's return to work at Aegis and Employee's employment with Aegis will be reinstated as if he[3] had never left employment with Aegis." The Agreement further states "'Good Standing' for purposes of this Agreement shall mean Employee completed the study program without any infraction of policy or any unexcused absences, as determined by the Company in its sole discretion and such determination shall be deemed final and binding between the parties." If the

---

[3] The Leave of Absence Agreement references "he" but was signed by Mandi Friend.

participant did not complete the program the bonus would be retained by ACG to cover the cost of the participant's travel to and from India.

Plaintiff saw a flyer posted on a cork board at the Joplin call center and applied for the program. Initially Plaintiff was not interviewed. Approximately two months later she was approached regarding her interest in the program. Plaintiff indicated she was still interested and had a short phone call with ACG's program recruiter. Plaintiff was able to ask any questions she had, she discussed the program details with the recruiter and then was told she was accepted into the program. Plaintiff was told she would be required to work and then attend class after her work hours.

After Plaintiff agreed to participate in the program, she was given the "Exchange Student Handbook." She then traveled to Dallas to meet the group that would be traveling to India. While in Dallas, Plaintiff met with ACG staff regarding the cross-shoring program. Plaintiff was given the opportunity to ask any question she had regarding the program. Plaintiff signed a leave of absence agreement with ACG on August 11, 2011. Plaintiff subsequently traveled to India and had approximately $4,000 when she arrived.

While participating in the Cross-Shoring Program, the participants were required to work in an Indian call center. Plaintiff voiced complaints to the HR manager in ACG's Joplin call center while she was in India regarding the Cross-Shoring program. Plaintiff's principal complaints were the pay and the food. Specifically, she complained the pay was insufficient and she did not like the food. Plaintiff's complaints were forwarded to ACG's Vice President of Human Resources and ACG's liaison for the Cross-Shoring Program, who were both in Texas. Plaintiff also complained to Aegis Aspire in India.

While in India, Plaintiff declined to show up for work one day because of frustration with the program. Plaintiff also missed work when she was sick. However, Plaintiff did not receive any adverse consequence for missing work while in India. Plaintiff contends she asked to leave India two months after she arrived because it was not what she agreed to. She also contends that she told employees in India that she wanted to go home. Plaintiff alleges she was told she would be fired from her job in Joplin if she left early. Plaintiff completed the program and upon her return from India, in August 2012, she was accepted into the ACE program and then subsequently began ACE Blue training for supervisors with ACG.

## **STANDARD OF REVIEW**

Summary judgment is proper if, viewing the record in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp., v. Catrett,* 477 U.S. 317, 322-23 (1986). The moving party is entitled to summary judgment as a matter of law if they can establish there is "no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Once the moving party has established a properly supported motion for summary judgment, the non-moving party cannot rest on allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 248.

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Id.* at 248-249. Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge. *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011).

**DISCUSSION**

A.  **Fraudulent and Negligent Misrepresentation – Counts I-II**

   1.  **Negligent Misrepresentation**

The elements of a claim for negligent misrepresentation are : (1) the speaker supplied information in the course of his business; (2) because of a failure by the speaker to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of a limited group of persons in a particular business transaction; (4) the listener justifiably relied on the information; and (5) due to the listener's justified reliance on the information, the listener suffered a pecuniary loss. *Ryann Spencer Group Inc. v. Assurance Company of America,* 275 S.W.3d 284, 288 (Mo. App. 2008).

Simply put, to maintain a claim for negligent misrepresentation, plaintiff must establish that due to a failure to exercise reasonable care, Defendants made false statements that plaintiff justifiably relied upon to her detriment. *Baum v. Helget Gas Products, Inc.,* 440 F.3d 1019, 1023 (8th Cir. 2006); *citing, Collins v. Mo. Bar Plan,* 157 S.W.3d 726, 734 (Mo. App. 2005). "A negligent misrepresentation claim cannot arise solely from evidence that the defendant did not perform according to a promise or statement of future intent." *Id.*

   2.  **Fraudulent misrepresentation**

To state a claim for fraudulent misrepresentation, plaintiff must prove (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in a manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the representation; (5) the hearer's reliance on its truth; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused injury. *Bohac v. Walsh,* 223 S.W.3d 858, 862-863 (Mo. App. 2007). "It is well-settled that an

unkept promise does not constitute actionable fraud unless it is accompanied by a present intent not to perform." *Urologic Surgeons, Inc. v. Bullock,* 117 S.W.3d 722, 726 (Mo. App. 2003). Further, "statements, representations, or predictions about an independent third party's future acts do not constitute actionable misrepresentation." *Massie v. Colvin,* 373 S.W.3d 469, 472 (Mo. App. 2012).

Both of Plaintiff's claims for misrepresentation are based on whether Defendants made materially false statements about the Cross-Shoring program upon which she relied in making her decision to participate in the program. Plaintiff claims Defendants made the following representations: (1) she would receive $100 stipend on the first of every month; (2) she would receive a calling card worth 500 rupees on the first of every month; (3) she would be living in a college campus in a dormitory; (4) she would work part-time hours; (5) she would attend classes with live instructors; (6) she would receive three meals per day; (7) she would be provided healthcare coverage by Aegis; and (8) she would be placed in the "ACE" program upon her return to Joplin.

First, Defendants argue that any actions taken by Aegis Aspire, the owner and operator of the Academy, are independent of, and not subject to the control of ACG or Aegis USA and therefore Defendants cannot be held liable for any representations made regarding the Cross-Shoring program. However, based on the record before the Court, a question of fact exists regarding the independence of Aegis Aspire and/or the Academy from the Defendants. The Defendants continued involvement with the participants in the Indian program, including their involvement with Plaintiff's complaints while she was in India, creates questions of fact with regard to their "independence" from the program. Further, the terms of the contract between ACG and Aegis Aspire, the evidence regarding the interaction between Plaintiff and individuals

7

from both companies during her training, and the information contained in the flyer Plaintiff reviewed further present genuine issues of material fact regarding Plaintiff's claims and in particular the relationship between ACG and Aegis Aspire.

Plaintiff's Complaint alleges that "all individually described perpetrators were agents, servants, and employees of defendant ACG and were at all times acting within the scope and course of their agency and employment…" Plaintiff has shown sufficient facts that a jury might be persuaded by her theory of respondeat superior and agency (whether by authorizing or ratifying the actions of Aegis Aspire or being liable for them on a theory of joint venture or other theory of agency). Therefore, Defendants' Motion for Summary Judgment on Plaintiff's negligent misrepresentation claim is denied.[4]

Next, Defendants argue that they did not make any statements to Plaintiff that they knew were false at the time they were made. As set forth herein, in order to give rise to fraud, a promise of future performance must be accompanied by a speaker's present intent not to perform. *See, e.g., Trotters Corp., v. Ringleader Rests.,* 929 S.W.2d 935, 940 (Mo. App. 1996). However, as set forth above, a genuine issue of material fact exists with regard to the independence of ACG and Aegis Aspire with regard to any statements made to Plaintiff. This alone creates a genuine issue of material fact to preclude summary judgment. If ACG is liable for Aegis Aspire's misstatements then knowledge by Aegis Aspire of the falsity of the representations may also be imputed to ACG.

---

[4] Plaintiff has set forth eight alleged misrepresentations. While the Court is not inclined to sort through each allegation, it notes that the record before it already indicates some of the allegations will not make it to a jury. For example, it is undisputed Plaintiff was placed in the ACE program after her return to Joplin. However, Plaintiff has submitted enough evidence to create a genuine issue of material fact with regard to her general claims, even though some of these allegations will not constitute misrepresentations.

Further, even if a jury were to find Defendants are independent of the Indian entities, and not liable for representations of the Indian entities, Plaintiff has provided enough evidence to create a question of material fact with regard to whether Defendants exercised reasonable care in making the statements about the Cross-Shoring program now alleged to be false and what information they knew about the program when promoting it. For these reasons, summary judgment on Counts I-II of Plaintiff's More Definite Second Amended Complaint is **DENIED**.

**B. Forced Labor – Count III**

Plaintiff brings a claim against defendants under 18 U.S.C. § 1589, the Trafficking Victims Protection Act ("TVPA"). Plaintiff seeks a civil remedy under this Act pursuant to 18 U.S.C. § 1595. Plaintiff alleges, in part, the Defendants made fraudulent misrepresentations and mistreated her in a way that constituted a scheme, plan or pattern that she believed would cause her to suffer severe harm if she did not continue to work in the Cross-Shoring Program.

Section 1589 states:

**(a)** Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--

    **(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
    **(2)** by means of serious harm or threats of serious harm to that person or another person;
    **(3)** by means of the abuse or threatened abuse of law or legal process; or
    **(4)** by means of any *scheme, plan, or pattern intended to cause the person to believe* that, if that person did not perform such labor or services, that person or another person would suffer *serious harm* or physical restraint,

shall be punished as provided under subsection (d).

**(b)** *Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture* which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has

9

>engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).
>
>**(c)** In this section:
>
>>**(1)** The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.
>>
>>**(2)** The term "*serious harm*" means any harm, whether physical or nonphysical, including psychological, *financial*, or *reputational harm*, that is sufficiently serious, under all the surrounding circumstances, *to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.* (*emphasis added*).

Several Courts have discussed the scope of the TVPA. The TVPA is "an Act to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions, in the United States and countries around the world through prevention, through prosecution and enforcement against traffickers, and through protection and assistance to victims of trafficking. The purpose of the Act is to 'combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominately women and children, to ensure just and effective punishment of traffickers. Many of the victims are 'trafficked into the international sex trade, often by force, fraud or coercion.'" *Nunag-Tanedo v. East Baton Rouge Parish School Board,* 790 F.Supp.2d 1134, 1143 (C.D. Cal. 2011); *citing,* H.R. Conf. Rep. 106-939, at 1 (2000). See also, *Antonatos v. Waraich,* 2013 WL 4523792 (D.S.C. August 27, 2013)(denying motion to dismiss claim under 18 U.S.C. § 1589).

In discussing the application of the TVPA, the Ninth Circuit stated "Congress intended to 'reach cases in which persons are held in a condition of servitude through nonviolent coercion'…

and the means used by modern-day traffickers are increasingly subtle." *U.S. v. Dann,* 652 F.3d 1160, 1169 (9th Cir. 2011). However, not all bad employer-employee relationships will constitute forced labor. *Id.* at 1170. Congress intended to address serious trafficking, and the threat considered from the vantage point of a reasonable person in the place of the victim must be sufficiently serious to compel the person to remain. *Id.*

While this Court believes Plaintiff's claim stretches the boundaries of the intended nature and purpose of this Act, Plaintiff has created a narrow but genuine issue of material fact to survive summary judgment. Plaintiff creates a factual question regarding whether an objectively reasonable person with the same background as Plaintiff and under her circumstances would have felt forced to continue performing labor in the Cross Shoring Program. Plaintiff alleges she was threatened with the loss of her job in Joplin, Mo if she left the Program and that she could not afford to return home. Plaintiff further claims that Defendants are liable, at a minimum, because they "knowingly benefited" from the Cross-Shoring Program. Defendants believe that Plaintiff cannot establish she was threatened with serious harm. However, at this juncture Plaintiff has alleged enough to survive summary judgment.

Defendants also argue that the TVPA does not apply because its focus is on the trafficking of people into the United States for the purpose of compelling forced labor. Specifically, Defendants argue the TVPA does not apply to "forced labor" in India and that the statute should not apply extraterritorially. They cite to *Liu Meng-Lin v. Siemens AG,* 2014 WL 3953672 (2nd Cir. August 14, 2014) for the proposition that the TVPA does not apply to Plaintiff's claims. In *Liu Meng-Lin* the plaintiff was a Taiwanese citizen and resident employed by a Chinese corporation. His complaint failed to plead that any of the events related to his claim occurred within the territorial jurisdiction of the United States. *Id.* at *1. Instead, he

11

alleged Siemens employees in China and North Korea were making improper payments to officials in China and North Korea. *Id.* The plaintiff alleged he was fired for reporting his allegations and then two months after he was fired he also reported the alleged conduct to the Securities and Exchange Commission. The plaintiff subsequently brought a lawsuit in the Southern District of New York alleging, in part, that Siemens had violated the antiretaliation provision of the Dodd-Frank Act. *Id.* Defendant moved to dismiss plaintiff's claims arguing, in part, the antiretaliation provision did not apply extraterritorially. *Id.* The District Court granted the motion to dismiss on this issue and the 2nd Circuit affirmed. *Id.*

However, a review of *Liu Meng-Lin* shows that the facts are dissimilar to the allegations in this case. Here, both Plaintiff and Defendants are U.S. citizens and the claims are based on conduct that occurred, in part, within the United States. For example, Plaintiff's claim is based on alleged misrepresentations she was given while still in Missouri and Texas. Further, Plaintiff communicated with the Defendants, who remained in the US, while she was in India. Plaintiff also alleges Defendants benefited in the U.S. from the work she performed in India. Defendants contend they are not responsible for the acts of Aegis Aspire or anything that occurred in India. However, as this Court has previously stated, the relationship between Defendants and Aegis Aspire is unclear and a genuine question of material fact exists regarding the independence, control and relationship between these entities. A genuine issue also exists with regard to whether Defendants benefited from the alleged forced labor. As such, summary judgment on Plaintiff's TVPA claim is improper.

Additionally, Defendants proffer that Plaintiff's allegation that "she would have been fired" is nothing more than a warning of adverse but legitimate consequences and that the undisputed facts establish Plaintiff missed work while in India but suffered no adverse

consequence as a result. Defendants also point to their allegation that Plaintiff had sufficient funds to return home but instead spent her money on cigarettes, alcohol, food and travel rather than saving it for her return to Missouri. Defendants urge the Court to find as a matter of law that based upon all these facts a reasonable person in similar circumstances would not have felt compelled to work.

The Court notes Plaintiff faces a difficult task of convincing a jury that a reasonable person in her financial condition would feel forced to tolerate the conditions she alleges she faced while participating in the Cross-Shoring Program. However, after careful review of the pleadings, the Court finds that the facts alleged by Plaintiff, when taken in a light most favorable to her, create a genuine issue of material fact to survive summary judgment on Count III and summary judgment on this claim is **DENIED**.

### C. Unjust Enrichment - Count IV

"An unjust enrichment has occurred where a benefit was conferred upon a person in circumstances in which the retention of the benefit, without paying its reasonable value, would be unjust." *S & J, Inc. v. McLoud & Co. LLC.,* 108 S.W.3d 765, 768 (Mo.App. 2003). A claim for unjust enrichment has three elements: (1) a benefit conferred by a plaintiff on a defendant; (2) the defendant's appreciation of the fact of the benefit; and (3) the acceptance and retention of the benefit by the defendant under circumstances in which retention without payment would be inequitable. *Hertz Corp. v. RAKS Hospitality, Inc.,* 196 S.W.3d 536, 543 (Mo.App. 2006). Demonstrating unjust retention of the benefit is the most significant element of unjust enrichment and also the most difficult to establish. *Executive Bd. of Mo. Baptist Convention v. Windermere Baptist Conference Ctr.,* 280 S.W.3d 678, 697 (Mo.App. W.D.2009). "Mere receipt

of benefits is not enough, absent a showing that it would be unjust for the defendant to retain the benefit." *Id.*

Plaintiff claims Defendants were enriched by her labor provided in the Cross-Shoring program in India. Specifically, Plaintiff alleges she was compensated with less than 100 dollars per month but provided services more valuable than that amount. Plaintiff argues it is reasonable to infer that Defendants received a benefit at Plaintiff's expense of at least $19.25 per hour. "The essence of unjust enrichment is that the defendant has received a benefit that it would be inequitable for defendant to retain." *Pitman v. City of Columbia,* 309 S.W.3d 395, 403 (Mo.App. W.D. 2010). Here, it is unclear where this amount of alleged benefit is derived from. Plaintiff participated in a Cross-Shoring program in which the terms included receiving a $100 stipend, housing, meals, and training courses through Cornell University, in exchange for her work at the call center in India. There is no evidence that Defendants were unjustly enriched by this arrangement. Plaintiff may ultimately demonstrate Defendants got the better end of the bargain but that falls short of proving unjust enrichment. Defendant's summary judgment motion with regard to Count IV is **SUSTAINED**.

### D. Breach of Contract - Count V

Plaintiff concedes in her response that her breach of contract claim fails as a matter of law. (Doc. No. 65 p. 3). Plaintiff states that "even if an implied contract exists" … "the Statute of Frauds invalidates it." Therefore, based on Plaintiff's concession, the Court **SUSTAINS** summary judgment on the breach of contract claim contained in Count V of Plaintiff's complaint in favor of Defendants.

## **CONCLUSION**

Wherefore, Defendants' Motion for Summary Judgment (Doc. No. 61) is **GRANTED** in part and **DENIED** in part, as described herein.

**IT IS SO ORDERED.**

DATED: September 9, 2014

                                           */s/ Douglas Harpool*
                                              **DOUGLAS HARPOOL**
                                              **UNITED STATES DISTRICT JUDGE**